**WO**

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF ARIZONA

| | |
|---|---|
| Barry L. Stern, M.D. and Judy Stern, husband and wife; and Barry L. Stern as trustee for the Urology Clinic Ltd Profit Sharing Plan, dated April 8, 1991,<br><br>Plaintiffs,<br><br>vs.<br><br>Charles Schwab & Co., Inc., a foreign corporation; Wells Fargo Bank, N.A., a foreign corporation,<br><br>Defendants. | No. CV-09-1229-PHX-DGC<br><br><br><br><br><br>**ORDER** |

Defendant Charles Schwab & Co., Inc. (Schwab) has filed a request for judicial notice (Dkt. #19) and a motion to dismiss and compel arbitration (Dkt. #18) pursuant to Rule 12(b)(1) and the Arizona and Federal Arbitration Acts. Defendant Wells Fargo Bank, N.A. (Wells Fargo) filed a motion to dismiss pursuant to Rules 8(a), 9(b), and 12(b)(6). Dkt. #21. Plaintiffs oppose both motions and the request for judicial notice. Dkt. ##25, 26. For the reasons that follow, the Court will deny Schwab's motion to dismiss and compel arbitration, deny Schwab's request for judicial notice, and grant Wells Fargo's motion to dismiss.[1]

---

[1] The requests for oral argument are denied. The parties have fully briefed the issues and oral argument will not aid the Court's decision. *See Lake at Las Vegas Investors Group, Inc. v. Pac. Malibu Dev. Corp.*, 933 F.2d 724, 729 (9th Cir. 1991).

## I. Background.

Between April and August of 2007, Plaintiffs Barry and Judy Stern invested $1,915,000 with Deborah Cheryl Bennett and Alva James Bennett. Dkt. #14 at ¶¶ 7, 46. The Sterns wrote personal checks which the Bennetts deposited in a Wells Fargo Portfolio Management Account. *Id.* at ¶ 46. The Bennetts then transferred the Sterns' money to a Charles Schwab One Brokerage Account and used the account to engage in various investment transactions. *Id.* at ¶ 49. The Sterns suffered serious financial losses. *Id.* at ¶ 13.

The Sterns allege that the Bennetts committed fraud, violated various securities laws, and ran a Ponzi scheme. Dkt. #26 at 3. The Sterns filed this action against Wells Fargo and Schwab in Arizona state court, alleging that both Defendants negligently allowed the Bennetts to commit fraud and aided and abetted the Bennetts' various torts. Defendants removed the action to this Court on the basis of diversity of citizenship. Dkt. #2.

## II. Schwab's Motion to Dismiss and Compel Arbitration.

The Bennetts used the Schwab account to invest the Sterns' money. Dkt. #14 at ¶ 49. Deborah Bennett opened the account in July of 2006 – almost one year before the Sterns began investing. When she opened the account, Bennett signed the "Schwab One® Brokerage Account Application Agreement" (the Schwab-Bennett contract). Dkt. #18-1 at 12, 16-18. The Schwab-Bennett contract contained the following arbitration provision:

> Section 16: Arbitration. You, your heirs, agents, and any other persons having or claiming to have a legal or beneficial interest in the Account, including court-appointed trustees and receivers (collectively "you") and Schwab agree to settle by arbitration any controversy between or among you, any bank through which the Visa debit card and checking account services are provided (the "Bank"), or us and/or any of our parents, subsidiaries, affiliates, officers, directors, employees or agents relating to the Account Agreement, your Account or account transactions, any other Schwab account in which you claim an interest, or in any way arising from your relationship with us or the Bank, including any controversy over the arbitrability of a dispute.

*Id.* at 17. Alva Bennett became a joint owner of the account about one month later and signed an agreement that the arbitration provision applied to him. The Sterns never signed the Schwab-Bennett contract, but Schwab asks the Court to enforce the arbitration provision against them.

Arbitration clauses are generally enforceable under the Federal Arbitration Act, which states that "[a] written provision in . . . a contract . . . to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable . . . ." 9 U.S.C. § 2; *see, e.g., Chiron Corp. v. Ortho Diagnostic Sys., Inc.*, 207 F.3d 1126, 1130 (9th Cir. 2000). Arbitration, however, "'is a matter of contract and a party cannot be required to submit to arbitration any dispute which he has not agreed so to submit.'" *Tracer Research Corp. v. Nat'l Envtl. Servs. Co.*, 42 F.3d 1292, 1294 (9th Cir. 1994) (quoting *United Steelworkers of Am. v. Warrior & Gulf Navigation Co.*, 363 U.S. 574, 582 (1960)). To compel arbitration, a court need not find that the party actually signed a written agreement. A nonsignatory may be bound to arbitrate based on "ordinary contract and agency principles" such as incorporation by reference, assumption, agency, veil-piercing, and equitable estoppel. *Comer v. Micor, Inc.*, 436 F.3d 1098, 1101 (9th Cir. 2006) (quoting *Letizia v. Prudential Bache Secs., Inc.*, 802 F.2d 1185, 1187-88 (9th Cir. 1986)).

Schwab argues that principles of equitable estoppel and agency bind the Sterns to the arbitration clause of the Schwab-Bennett contract. The Court does not agree.

**A.  Equitable Estoppel.**

"Equitable estoppel 'precludes a party from claiming the benefits of a contract while simultaneously attempting to avoid the burdens that contract imposes.'" *Id.* (quoting *Wash. Mut. Fin. Group, LLC v. Bailey*, 364 F.3d 260, 267 (5th Cir. 2004)). When a nonsignatory "receives a 'direct benefit' from the underlying contract," Arizona courts apply the doctrine of equitable estoppel and enforce the contract as to him – including any arbitration provision. *World Group Secs., Inc. v. Allen*, 2007 WL 4168572, *3 (D. Ariz. 2007) (quoting *Zurich Am. Ins. Co. v. Watts Indus., Inc.*, 417 F.3d 682, 688 (7th Cir. 2005)).[2]

---

[2] Courts have applied different standards when determining whether a nonsignatory should be held to an arbitration provision. Arizona courts apply the "direct benefit" test. *See, e.g., Allen*, 2007 WL at *3; *Schoneberger v. Oelze*, 96 P.3d 1078, 1081 (Ariz. 2005). The Ninth Circuit applied a slightly different test in *Comer*, asking whether the nonsignatory "knowingly exploited" the agreement. 436 F.3d at 1101. Because it fails the direct benefit test, Schwab also would fail the more demanding "knowingly exploited" test.

1 | Schwab argues that the Sterns received a direct benefit from the Schwab-Bennett contract because the contract allowed the Sterns to invest the Bennetts' money. In support of its argument, Schwab relies primarily on *American Bureau of Shipping v. Tencara Shipyard S.P.A.*, 170 F.3d 349 (2d Cir. 1999). In *Tencara*, a group of boat owners commissioned a builder to construct a yacht and have it "classified" by the American Bureau of Shipping. *Id.* at 351. The boat owners wanted the boat classified because it would allow them to obtain lower insurance rates. The builder signed a contract with the Bureau which required the Bureau to oversee design and construction of the yacht. The contract contained an arbitration provision. After construction was complete, the yacht owners discovered a design defect and sued the Bureau. *Id.* at 351-52. Applying the doctrine of equitable estoppel, the Second Circuit held that the arbitration provision in the builder-Bureau contract was binding on the boat owners because those owners received substantial and direct benefits from the contract in the form of lower insurance rates. *Id.* at 353. Schwab argues that the Sterns likewise should be equitably estopped from avoiding the arbitration provision because they received a direct benefit from the Schwab-Bennett contract – the ability to invest with the Bennetts. The Court is not persuaded.

The Schwab-Bennett contract merely provided a vehicle through which the Bennetts implemented their investment business; it conferred no direct benefit on the Sterns. The contract was signed well before the Sterns invested with the Bennetts. All of the allegations and evidence suggest that the Sterns elected to invest with the Bennetts, not with Schwab, and did so because of the Bennetts' purported investment expertise and the Bennetts' promises of substantial returns. The Sterns did not require the Bennetts to enter into the Schwab-Bennett contract as did the boat owners in *Tencara*, did not seek or receive investment advice from Schwab, and did not receive money or other consideration from Schwab. Nor did the Sterns receive other direct benefits such as the lower insurance rates in *Tencara* or the fees in *Allen*. Schwab has presented no evidence to suggest that the Schwab account played any role whatsoever in the Sterns' investment decision.

Even if it could be argued that the Schwab-Bennett contract created an opportunity for the Sterns to invest with the Bennetts – an argument that itself is unpersuasive because the Bennetts could have provided the same opportunity through any number of investment firms – the opportunity to lose more than $1 million certainly cannot be characterized as a benefit. And the benefit, if it could be called one, was at most indirect. The contract created a vehicle for the Bennetts, not the Sterns, to use in making investments. In sum, because the Sterns received no direct benefit from the Schwab-Bennett contract, equity does not demand that they be subject to the arbitration provision – a provision they never signed or ratified.

**B.     Agency.**

A nonsignatory is bound to a contract signed by his agent. *See, e.g., Ruesga v. Kindred Nursing Ctrs. West, L.L.C.*, 161 P.3d 1253, 1263 (Ariz. App. 2007); *Comer*, 436 F.3d at 1101. Schwab argues that the Sterns are bound by the contract because an agency relationship existed between them and the Bennetts. The Sterns respond that no agency relationship existed when the contract was signed.

Although Schwab argues that the Sterns are bound by an agreement signed before the agency relationship came into existence, none of Schwab's authority holds that a principal is bound by a contract signed before the agency relationship was formed – or, as in this case, before the agency relationship was even contemplated. *See Rice Co. (Suisse), S.A. v. Precious Flowers Ltd.*, 523 F.3d 528, 538 (5th Cir. 2008); *Comer*, 436 F.3d at 1101; *E.I. DuPont de Nemours & Co. v. Rhone Poulenc Fiber & Resin Intermediates, S.A.S.*, 269 F.3d 187, 198 (3d Cir. 2001); *ChampionsWorld, LLC v. U.S. Soccer Fed'n, Inc.*, 487 F. Supp. 2d 980, 986 (N.D. Ill. 2007). For a principal to be bound by an arbitration provision, the agent must have acted on behalf of the principal. *Intergen N.V. v. Grina*, 344 F.3d 134, 147-48 (1st Cir. 2003). Because no agency relationship existed when the Schwab-Bennett contract was signed, the Bennetts cannot be said to have acted on behalf of the Sterns in signing the contract. Agency principles do not bind the Sterns to arbitration.

**III. Schwab's Request for Judicial Notice.**

Schwab asks the Court to take judicial notice of several documents relating to the Bennetts' bankruptcy and litigation between the Sterns and the Bennetts. Dkt. #19 at 1-2. A court "may take notice of proceedings in other courts, both within and without the federal judicial system, if those proceedings have a direct relation to matters at issue." *United States v. Borneo, Inc.*, 971 F.2d 244, 248 (9th Cir. 1992) (citations omitted). Schwab has not shown, however, that the litigation documents are directly related to matters at issue in the motion to dismiss. Because the documents are not relevant to the issues raised by Schwab in the pending motion, the Court will deny the request for judicial notice.

**IV. Wells Fargo's Motion to Dismiss**.

The Wells Fargo Portfolio Management Account belonged to the Bennetts. The Sterns allege the Bennetts used the account to perpetrate fraud by shifting money in and out of the account and using it to operate a Ponzi scheme. Dkt. #26 at 2-3. The Sterns assert claims against Wells Fargo for (1) negligence, (2) aiding and abetting a breach of fiduciary duty, aiding and abetting fraud, and aiding and abetting securities fraud, and (3) punitive damages. Wells Fargo moves to dismiss all claims pursuant to Rules 8(a), 9(b), and 12(b)(6). The Court will consider each claim in turn.[3]

When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). "To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," demanding instead sufficient factual

---

[3] The Sterns object to the Court taking judicial notice of certain documents in ruling on a motion to dismiss. Dkt. #26 at 2 n.1. The Court has not relied on the documents in deciding this motion.

allegations to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ---, ---, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 1950 (citing Fed. R. Civ. P. 8(a)(2)).[4]

A court may not assume that the plaintiff can prove facts different from those alleged in the complaint. *Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983). Similarly, legal conclusions couched as factual allegations are not given a presumption of truthfulness and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998).

**A.   Negligence.**

The tort of negligence requires a plaintiff to prove that the defendant owed the plaintiff a duty to conform to a certain standard of care. *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). Wells Fargo argues that the Sterns have pled no facts showing that Wells Fargo owed them a duty. The existence of duty is a matter of law for the Court. *Id.* The Court agrees that, on the facts alleged, Wells Fargo owed no duty to the Sterns.

The Sterns do not specifically allege in the complaint that they were customers of Wells Fargo while they were investing money with the Bennetts between April and August of 2007. They allege only that they were customers of the bank "[a]t various times." Dkt. #14 at ¶ 47.[5] Given the Sterns' extensive efforts to plead a duty on the part of Wells

---

[4] The Sterns argue that a motion to dismiss may be granted only where it appears, beyond doubt, that the plaintiff can prove no set of facts that would entitle it to relief. Dkt. #26 at 4. This standard, which originated in *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957), was retired by the Supreme Court in *Twombly*. 550 U.S. at 563.

[5] In addition to paragraph 47, the Sterns' reply memorandum cites to paragraph 10 of the First Amended Complaint. Dkt. #26 at 7. Paragraph 10 alleges that the Sterns "are" customers of Wells Fargo; it says nothing about their banking relationship with Wells Fargo

Fargo, the Court assumes they would have alleged a customer relationship with Wells Fargo between April and August 2007 had one existed. The Sterns nonetheless allege that Wells Fargo owed them a duty to "disclose known or knowable fraud, and also to monitor, investigate, and stop any unusual account activity" – in other words, a duty to find the alleged fraud in the Bennetts' account and notify the Sterns and the authorities.

The relationship between a bank and an ordinary depositor is no more than that of debtor and creditor – a relationship that does not give rise to a fiduciary duty. *McAlister v. Citibank*, 829 P.2d 1253, 1258 (Ariz. App. 1992). Absent a fiduciary duty or some other "special circumstances," a bank has no duty to disclose to a customer the existence of potential fraud by another customer. *Wells Fargo Bank v. Arizona Laborers*, 38 P.3d 12, 22 (Ariz. 2002) (*Arizona Laborers*) (discussing *Kesselman v. Nat'l Bank of Ariz.*, 937 P.2d 341 (Ariz. App. 1997)). Under simple negligence standards, a bank "is under no duty to private investors to take affirmative measures to avoid loss caused by" fraud of one of the bank's customers. *Id.* (discussing *Kesselman*, 937 P.2d at 345-46). In fact, banks have a duty not to disclose their customers' financial conditions to anyone else. *Kesselman*, 937 P.2d at 343.

The Sterns argue that a duty exists in this case because the "special circumstances" requirement of *Arizona Laborers* is satisfied by Wells Fargo's knowledge of the Bennetts' fraud. *Arizona Laborers* explained, however, that special circumstances exist "when a bank has *actual knowledge* of the fraudulent activities of a customer[.]" 38 P.3d at 22 (emphasis added). The Sterns do not allege that Wells Fargo had actual knowledge of the Bennetts' fraud. They allege instead that Wells Fargo "knew or was generally aware" of the large deposits and withdrawals in the Bennetts' accounts, and knew that this activity was inconsistent with the Bennetts' prior banking history and "raised numerous red flags of

---

from April through August of 2007. *See* Dkt. #14 at ¶ 10. Even if the complaint directly alleged that the Sterns were customers of Wells Fargo at the time of the alleged fraud, however, the Court would conclude, for the reasons that follow, that the Sterns have not pled facts sufficient to give rise to a duty on the part of Wells Fargo.

- 8 -

fraudulent or other illegal activity." Dkt. #14 at ¶¶ 52-53. Red flags, however, do not amount to the "actual knowledge" of fraud required by *Arizona Laborers*.

The Sterns allege that a vice president of a different Wells Fargo company – Wells Fargo Business Credit Company, Inc., located in Milwaukee, Wisconsin – invested with the Bennetts. Dkt. #14 at ¶ 56. But the Sterns allege no facts to suggest that the vice president knew the Bennetts were engaged in fraud. *Id.* at ¶ 57. The Sterns allege that the vice president's investment violated Wells Fargo's internal code of ethics, *id.* at ¶ 58, but this does not show that the vice president knew of the Bennetts' fraud. Nor is it plausible to suggest that the vice president would have invested $270,000 of her own money and involved her husband and other relatives in the investments, as the Sterns allege (¶ 56), had she known the Bennetts were running a fraudulent ponzi scheme. The allegations concerning the vice president do not plausibly show "actual knowledge" of the fraud as required by *Arizona Laborers*.[6]

Citing the Arizona Supreme Court's decision in *Gipson*, 150 P.3d 228, the Sterns argue that public policy imposes a duty to monitor, investigate, and disclose. The defendant in *Gipson* gave prescription pills to a co-worker's girlfriend, the girlfriend gave the pills to the co-worker, and the co-worker took the pills and died as a result. The court held that the defendant had a duty to the co-worker as a matter of public policy. The duty, however, was based entirely on the defendant's violation of a criminal statute making it illegal to distribute prescription drugs. *Gipson* held that a criminal statute can create a duty in tort, but only if the statute is designed to protect the plaintiff's class of persons against the type of harm that resulted from the statutory violation. *Id.* at 233.

The Sterns argue that several Arizona statutes prohibiting securities fraud, consumer fraud, and racketeering create a duty between Wells Fargo and the Sterns. The Sterns also

---

[6] Even if the vice president had knowledge that could be imputed to her employer, the Sterns allege that her employer was not Wells Fargo but a separate, related corporation located in Wisconsin. Dkt. #14 at ¶ 56. The Sterns do not explain how knowledge imputed to the separate corporation could in turn be imputed to Wells Fargo in this action.

- 9 -

refer to federal money laundering statutes and even the Patriot Act. These state and federal statutes could create a negligence duty under *Gipson*, however, only if Wells Fargo violated them. Wells Fargo is not accused of securities fraud, consumer fraud, or money laundering, and the Sterns do not allege that Wells Fargo violated the Patriot Act. Rather, Wells Fargo stands accused in this case of failing to detect fraudulent activity in one of its customer's accounts and failing to close the accounts or disclose the activity to law enforcement. The Sterns cite no statute that makes such conduct criminal as required in *Gipson*.

The Sterns assert that Wells Fargo had an obligation to file suspicious activity reports under federal and state law. But in addition to the fact that the statutes cited by the Sterns are not criminal, the Sterns make no attempt to show that the statutes are designed to protect the Sterns and other similarly situated persons from the type of harm that resulted from the Bennetts' fraud. *Gipson*, 150 P.3d at 233. Moreover, as Wells Fargo notes, these statutes require that suspicious activity reports filed with the government be kept confidential. *See* A.R.S. § 6-1241(O); 31 U.S.C. § 5318(g). Numerous courts have held that they do not give rise to private rights of action. *See, e.g., S. Appalachian Coal Sales v. Citizens Bank of N. Ky.*, 2008 WL 4467297, *11 n.15 (E.D. Ky. 2008); *Carran v. Morgan*, 2007 WL 3520480, *5 (S.D. Fla. 2007); *Commerce Bank/Penn. v. First Union Nat'l Bank*, 911 A.2d 133 (Pa. Super. Ct. 2006).

In sum, the Sterns have failed to plead facts sufficient to show that Wells Fargo owed a duty to the Sterns to monitor, investigate, and disclose unusual activity in the Bennetts' account. The Court will grant Wells Fargo's motion to dismiss the negligence claim.

**B.     Aiding and Abetting.**

To state a claim for aiding and abetting, the Sterns must plead three elements: (1) the Bennetts committed a tort that caused injury to the Sterns, (2) Wells Fargo knew the Bennetts' conduct constituted a tort, and (3) Wells Fargo substantially assisted or encouraged the Bennetts in the achievement of the tort. *Arizona Laborers*, 38 P.3d at 23. Wells Fargo argues that the Sterns have not met the second or third elements. The Court agrees.

### 1. Knowledge of the Fraud.

The Arizona Supreme Court has stated that "'aiding and abetting liability is based on proof of scienter . . . the defendants must *know* that the conduct they are aiding and abetting is a tort.'" *Arizona Laborers*, 38 P.3d at 23 (quoting *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186 (Minn. 1999) (ellipsis and emphasis in original)). Seeking to avoid this strict knowledge requirement, the Sterns cite to the Arizona Supreme Court's later statement in *Arizona Laborers* that "all the details" of the fraud need not be known and that a "general awareness" of the fraudulent scheme will suffice. *See id.* at 26.

Arizona cases applying the scienter requirement of *Arizona Laborers* make clear, however, that mere knowledge of suspicious activity is not enough. The defendant must be aware of the fraud. In *Dawson v. Withycombe*, 163 P.3d 1034 (Ariz. App. 2007), the Arizona Court of Appeals held that knowledge of a defrauder's poor financial condition or dishonesty was not enough to satisfy the scienter requirement for aiding and abetting: "That Turner and Withycombe were aware of Futech's financial condition and of Goett's dishonest character, and were aware that he was soliciting funds from Dawson, indicates poor judgment and risky business practices. It does not, however, rise to the level of scienter required for aiding and abetting, specifically that they were *aware* that Goett *did or would in fact* use fraudulent statements as a means of procuring the loan." *Id*. at 1053 (emphasis in original). *Dawson*, which applied the language from *Arizona Laborers* upon which the Sterns rely, thus makes clear that suspicion is not enough. The aiding and abetting defendant must be aware of the fraud. This holding comports with the statement in *Arizona Laborers* that the defendant must have "'general awareness' *of the customer's fraudulent scheme*." 38 P.3d at 26 (emphasis added).

In attempting to plead scienter, the Sterns allege the following facts: (1) Wells Fargo knew the Bennetts' occupational and financial history, including that Mr. Bennett was retired, Mrs. Bennett was unemployed, and the Bennetts had diminishing savings, a lack of income, and substantial debt; (2) the Sterns deposited almost $2 million in the Bennetts' account over the course of five months in 2007; (3) millions of dollars in deposits and

withdrawals were made into and out of the Bennetts' account during the same general period; (4) Wells Fargo had duties under various statutes to monitor, supervise, investigate, detect, and report fraud or other illegal activities; and (5) the vice president with a different Wells Fargo entity in Wisconsin invested in the Bennetts' fraudulent scheme. Dkt. #26 at 15-16.

The fourth of these five points is a legal conclusion that need not be credited as true when deciding this motion to dismiss. *Iqbal*, 129 S.Ct. at 1949. Moreover, whether or not the fourth point is a correct statement of the law, it says nothing about the state of Wells Fargo's actual knowledge in this case.

The fifth point also says nothing about Wells Fargo's awareness of the Bennetts' fraud. As already discussed, the fact that a vice president of a related corporation in another state was also duped into investing with the Bennetts does not show that Wells Fargo knew of the fraud.

This leaves points one, two, and three – that Wells Fargo knew of the Bennetts' precarious financial situation, knew that the Sterns deposited almost $2 million in the Bennetts' account over the course of five months, and knew that substantial deposits and withdrawals were made into and out of the account during the same period. These alleged facts, taken as true, show no more than did the facts in *Dawson*. They may suggest that Wells Fargo engaged in poor business practices, but they do not show that Wells Fargo knew, generally or specifically, that the Bennetts were perpetrating a fraud. Knowledge of suspicious activity is not enough. The Sterns have failed to plead the scienter required for aiding and abetting liability under Arizona law.

### 2. Substantial Assistance.

Proof of substantial assistance requires a showing that Wells Fargo's conduct was "a substantial factor in causing the [Sterns'] harm." *In re Am. Cont'l Corp.*, 794 F. Supp. 1424, 1434-35 (D. Ariz. 1992) Processing day-to-day transactions does not constitute substantial assistance unless the bank has an "extraordinary economic motivation to aid in the fraud." *Arizona Laborers*, 38 P.3d at 27.

The Sterns allege that Wells Fargo provided substantial assistance by "allowing the Bennetts to open and continue maintaining personal accounts," "failing to supervise and monitor those accounts," "extending significant credit," "failing to investigate the source of deposits," "permitting transactions in the millions of dollars that lacked business sense," "permitting transactions" that allowed a Ponzi scheme to continue, "accepting deposits and transferring" money despite "red flags," and "failing to detect, act upon, report and/or stop the fraud." Dkt. #14 at ¶ 21. Most of these allegations are typical banking transactions – allowing the Bennetts to open and continue maintaining personal accounts, extending significant credit, permitting transactions in the millions of dollars, and accepting deposits and transferring money. The Sterns have not alleged, however, that Wells Fargo had an extraordinary economic motivation. The only benefits the Sterns allege are ordinary account fees and credit interest. Dkt. #14 at ¶ 96. This is not enough. *Arizona Laborers*, 38 P.3d at 27 (holding that the bank had an extraordinary motivation when assisting in the fraud would ensure that the customer would not default on a loan worth millions of dollars).

The remaining allegations assert inaction on the part of Wells Fargo and are largely conclusory – failing to supervise and monitor the accounts, failing to investigate the source of deposits, and failing to detect, act upon, report and stop the fraud. These allegations do not include affirmative actions that substantially assisted the Bennetts, and the Sterns have cited no authority for the proposition that inaction can satisfy the substantial assistance requirement of aiding and abetting in the absence of knowledge of the fraud. At bottom, the Sterns allege that Wells Fargo provided banking services to the Bennetts. Because those services were not provided in a setting of extraordinary economic motivation or with knowledge of the Bennetts' fraud, the Sterns have not sufficiently pled the substantial assistance element of aiding and abetting.

**C.    Punitive Damages.**

Because the Court will dismiss all other claims against Wells Fargo, the punitive damages claim will also be dismissed.

**IT IS ORDERED:**

1. Defendant Schwab's motion to dismiss and compel arbitration (Dkt. #18) is **denied**.
2. Defendant Schwab's request for judicial notice in support of its motion to dismiss (Dkt. #19) is **denied**.
3. Defendant Wells Fargo's motion to dismiss (Dkt. #21) is **granted**.

DATED this 15th day of October, 2009.

*David G. Campbell*
David G. Campbell
United States District Judge