**EXHIBIT 10**

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF ARIZONA

|  |  |
|---|---|
| Barry L. Stern, M.D., and Judy Stern, husband and wife; and Barry L. Stern as trustee for the Urology Clinic Ltd Profit Sharing Plan, dated April 8, 1991, )<br><br>Plaintiffs )<br><br>vs. )<br><br>Charles Schwab & Co., Inc., a foreign corporation; Wells Fargo Bank, N.A. a foreign corporation )<br><br>Defendants ) | No. CV-09-1229-PHX-DGC |

## AFFIDAVIT OF CHARLES H. GRICE

**November 6, 2009**

1. My name is Charles H. Grice. I have been retained in this matter by plaintiff's counsel on behalf of the Barry L. Stern and Judy Stern.

2. I have attached my CV as an exhibit to this affidavit. I am a banking consultant with 31 years of experience working for, advising and providing consulting to banks on compliance and operational issues. My areas of expertise include private banking, preventing and detecting "Ponzi" schemes, preventing and detecting money laundering,

1

and investigating and preventing emerging bank frauds. I have consulted to banks continuously since 1988, and have taught hundreds of seminars on these topics throughout the United States and in the major economies and parts of the developing world. As part of my job, I have served as the designated compliance officer of my bank clients, overseeing audit and compliance departments, purchasing and maintaining software systems, and reporting to banking supervisors and Boards of Directors. I have received many honors, have represented the U.S. in international banking conferences, and am a frequent keynote speaker for the major banking trade associations, including the California Bankers Association. I have testified several times to the U.S. Congress, Federal Reserve Board, US Treasury, state banking departments, international supervisory agencies, foreign government agencies, and state and federal courts.

3. My firm, CRI Compliance, is a bank consulting firm serving large US and international banks since 1988. The firm is an outgrowth of the California Bankers Association. Staff and consultants are all former bankers, bank lawyers, or bank examiners with the Federal Reserve, FDIC, or US Treasury Department.  Relevant to this assignment, CRI is the sole non-legal firm working as a member and co-founder of the Madoff Global Alliance, an international consortium of attorneys representing victims of the Madoff fraud.

4. My training is in economics and finance. I earned a BA from Johns Hopkins, a Master's in Public Policy (MPP) from Harvard's Kennedy School of Government, and completed 2 additional years of training in the George Washington University graduate economics department.  I am a former Fulbright Fellow (Brazil, 1983) and received one of 45 Kellogg National Fellowships (1989-1992).

5. Earlier in my career, I worked for the Federal Reserve Board, the U.S. Senate, and Kroll, a global investigations and forensics company. I have also served as a bank employee at the Johns Hopkins Credit Union, Bankers Trust, Asahi Bank of California, Asahi Bank Ltd (Japan), First Commercial Bank USA, and First Commercial Bank Ltd (Taiwan), and performed a consulting engagement on financial crimes for the FBI as part of my graduate study.  Over the 31 years, I have provided to consulting to hundreds of banks and financial firms.

6. In this engagement, my objective has been to analyze the banking transactions by the Bennetts.  In particular, I wanted to determine the degree to which the Bank **had actual knowledge** of the ponzi scheme.  My analysis was especially focused on the early run-up in the fraud, when the volume of money passing through the account accelerated and the Bank was providing an unusually extensive array of products and services to the Bennetts.

2

## 7. Knowledge of the Fraud

In examining the Bank's knowledge of the Bennett fraud, there were several related questions that I considered. Each is addressed separately below.

- What are the salient features of Wells Fargo Bank in this fraud?

- To what extent do banks such as Wells Fargo have systems designed to prevent or detect fraud?

- How should the Bennett accounts and transactions be characterized? To what extent were they "average" or "normal" accounts? What features did the accounts possess? Were these automatic or were these features added with banker assistance?

- What were the financial benefits to the Bank? Were the Bennett accounts unusually profitable to the Bank?

- Were there transactions or attributes of the accounts that would have required Wells Fargo Bank personnel to intercede or intervene early in the fraud?

- To what degree were employees of the Bank required to intercede or intervene to enable the accounts to process their respective transactions?

- Assuming the account was examined in *January 2007*, what would have been seen and known?

- What business records does the Bank possess that would help to determine additional knowledge?

- How would peer banks treat these accounts and transactions?

- Based on what is now available, and in my professional opinion, was the Bank aware of the fraud? Did Wells Fargo Bank have actual knowledge of the fraud?

In theory, the **best way** to answer questions about the Bank's knowledge would be to interview the Bank officers responsible for the Bennett accounts, as well as the staff responsible for detecting violations of the account agreement, audit and compliance personnel, the Branch supervisors at the respective branches, and the examiners from the Office of Comptroller of the Currency, Wells Fargo's primary supervisors. This

3

is not yet possible.

The **second best** way of determining the Bank's knowledge would be to review the Bank's **internal business records**. In this review, I have not been able to see the types of records that are routinely created and maintained by banks, such as check kiting reports, velocity reports, overdraft reports, account profitability analyses, audits, compliance testing, or reports of state and federal banking supervisors. This is not yet possible.

Because these preferred ways were not available for this review, and in order to answer this question without the benefit of these interviews and internal business records, I looked to the **third best** source of the Bank's knowledge, namely the Bank's own books and records provided to the Bennetts and produced for counsel in various proceedings involving the Bennetts. I was able to review the original account agreements, the signature cards, and monthly statements for 2005, 2006, and part of 2007. I also reviewed the analysis of the same data prepared by Simon Consulting.

### 8. What are the salient features of Wells Fargo Bank in this fraud?

Wells Fargo Bank, the nation's 4th largest bank during 2007-2008, is supervised by the Office of Comptroller of the Currency, a unit of the U.S. Treasury Department. The result of over 100 mergers and acquisitions, Wells Fargo had 6000 branches and had 159 thousand employees at year-end 2006. The Bank is a leading bank in most western states and dominates the Arizona market. The Bank has a large and sophisticated operations platform, and a strong reputation for profitability.

The Bank has had serious compliance and operational failures in the recent past. The most notable was a series of violations of the Bank Secrecy Act in 2004-2005 which led to a period of intense enforcement activity. Following the discovery and prosecution of very serious violations at Riggs Bank in 2004 (which ultimately led to the Bank's sale), Wells Fargo was criticized for inadequate monitoring of high risk accounts and for the lenient treatment it received by the OCC. The Senate Banking Committee discussed the Bank's failures in contentious public hearings and the OCC was criticized for its handling of the matter.

In analyzing the Bennett accounts, I first looked at the accounts in question to understand how these compare to traditional consumer or retail checking accounts. The origin of the Bennett relationship dates to a 1996 account opening at **Norwest Bank**, one of the many legacy banks acquired by Wells Fargo.

The Bennett accounts are housed in Wells Fargo Bank's **Portfolio Management Account (PMA)** area, a relatively new area of the Bank. This unit performs "private banking" services for clients with more than $1million in Wells Fargo-related assets. The PMA accounts would be considered as private banking in other retail banks, with higher levels of service, higher fees, and much higher levels of client care and most personal involvement. According to the 2007 Wells Fargo annual report, "We want to give our highest-value customers the most personalized service possible." (Wells Fargo Annual Report, 2007, p. 7).

During the 2006-2007 timeframe, Wells Fargo Bank was very concerned with growing this piece of the Bank.  Again, according to the annual report, "Our #1 strategic initiative is to grow our investments and insurance businesses to 25 percent of our company's total earnings. We continue to make good progress." (Wells Fargo, 2007, p. 7)

Accounts such as the Bennetts were instrumental for growing the private banking area in the Arizona market. While private banking accounts present higher than average levels of compliance and operational risk, they also give the Bank access to clients and potential clients throughout the region.  In my experience, growth of private banking relationships is primarily through referral networks.

Absent the fraud and scandal, the Bennett accounts would be **unusually profitable** to a bank such as Wells Fargo. The Bennetts used many products and services of the Bank, including deposit and loan services. The Bennetts aggressively borrowed and repaid their lines of credit and credit cards during their Ponzi scheme. The accounts generated very substantial income for the Bank, both directly (fees and interest charges) and indirectly. The accounts were a portal for many millions of dollars that could be steered to Wells Fargo investment products. And these deposits represented potential growth for the Bank. The financial benefits and profitability are discussed in more detail below.

### 9. To what extent do banks such as Wells Fargo have systems designed to prevent or detect fraud?

Banks operate in a highly regulated environment and must satisfy many laws and regulations in order to ensure a safe and transparent financial system. Chief among these public policy obligations is the obligation to preserve the banking system and protect the public from financial crimes such as fraud, money laundering, drug traffic, terrorism, check kiting, check fraud, ponzi schemes, and embezzlement. Commerce requires, among other things, carefully executed transactions and a financial system that is transparent, reliable, trustworthy, and fair.  Financial crimes erode trust and diminish confidence in financial institutions and harm the public.

5

For each of these public policy objectives, federal and state governments have created requirements for banks on how they manage accounts and process transactions. For example, check kiting is a federal crime and prohibited by federal and state law. By regulation, Wells Fargo must be able to detect check kiting immediately to protect itself, its clients and the public from losses.

The crime of "kiting" is characterized by clients depositing checks and writing new checks faster than the banking system's ability to collect the funds.  Kite schemes are a kind of Ponzi scheme in that the last round creates the largest victims; in a kiting scheme the biggest victim is the slowest bank to detect the fraud. Banks such as Wells Fargo have elaborate systems with account alarms for detecting the early warning signs of check kiting. Banks such as Wells produce daily Check Kiting reports, Velocity reports, Large Balance reports, Large Item reports, and Returned Check reports (to name but a few).

Wells Fargo is also required to have internal control systems in place to prevent other criminal uses of the Bank, crimes including money laundering, "structuring," tax evasion, commercial and mortgage loan fraud, embezzlement, and illegal securities trading. According to extensive federal bank law and regulation, the Bank is required to have a robust compliance program, including detailed risk assessments, skilled compliance personnel, policies and procedures, automated monitoring systems, and independent audit and testing systems. These systems are evaluated through annual exams by supervisors such as the OCC, and both internal and external bank auditors.

**10. How should the Bennett accounts and transactions be characterized? To what extent were they "average" or "normal" accounts?  What features did the accounts possess? Were these automatic or were these features added with banker assistance?**

The Bennett accounts housed in Wells Fargo were not average or customary bank accounts in any sense. The activity levels were far beyond industry averages by almost all measures. For example, the Bennetts frequently had over $1 million on deposit, had extensive numbers of electronic transfers between banks and third parties, and carried very high balances on their credit lines and Bank credit cards. The Bennetts generated very high profits to the Bank. And the Bennetts took full advantage of far more Bank products, services or capabilities than the average retail bank customer.

The basic account structure created for the Bennetts was the Wells Fargo's **Portfolio Management Account** (PMA), discussed elsewhere as a pillar of the Wells Fargo private banking capability.  The PMA created for the Bennetts was a portfolio of services, combining 2 checking accounts (7479 and 8791) with 2 personal lines of credit (9441 and 1784), a "reserve" line of credit (7815), and 3 associated Wells Fargo credit cards.

The Bennetts aggressively used the credit services provided by the Bank.  As a general matter, the credit lines and credit cards were very fully drawn by the Bennetts, such that there was very little available credit beginning in 2006. The credit lines were drawn, repaid, drawn and repaid, such that the credit facilities became an important tool for the Bennetts' scheme.

The Bank provided enhanced services to these accounts. The Bennetts' primary checking account [8791] was "enabled" by personnel from the Bank such that the Bennetts could perform many unusual transactions through the accounts. These enabled features are not common features (such as check writing or ATM use) and would require banker-intervention.  These unusual or enabled features are discussed elsewhere.

Wells Fargo Bank elected to provide the Bennetts with an account feature that greatly assisted their fraud. It appears from the statements that the Bank made the deposits **immediately available** to the Bennetts, rather than require the checks to "clear" per Regulation CC (governing Expedited Funds Availability). This is a decision by the Bank's personnel (and watched closely by senior management) to provide funds before the Bank knows if the deposited funds are "good" or not. For example, according to the statements, checks drawn on the Schwab account by the Bennetts and those deposited by the victims to the fraud were treated as "cash" by Well Fargo. This enabled the Bennetts to make immediate use of the funds, to use for personal purchases or to place into Schwab.

The 8791 account also was enabled by Bank personnel to **transfer funds automatically** between the Wells Fargo checking account and the 3 Wells Fargo lines of credit (1784, 7815, and 9441), and the Schwab One account, the American Express account (D. Bennett), 2 Discover accounts (A. and D. Bennett), Household Finance Corporation, Western Union, Mercedes Benz auto finance, and the auto finance subsidiary of JP Morgan Chase Bank.

Together, these features provided to the Bennetts by Wells Fargo with the credit, the instant funds availability, and the mechanisms for rapid funds transfer that boosted their lethal scheme's effectiveness.

## 11. What were the financial benefits to the Bank? Were the Bennett accounts unusually profitable to the Bank?

The Bank fared well financially in its relationship with the Bennetts.  The Bank extended and was repaid large sums in part using the proceeds of the Ponzi scheme.  Based on Wells Fargo Bank records, it appears the Bank received on a gross basis at least **$389,763** during the life of the Bennett's Ponzi scheme.  The Bennett's lines of credits and credit

cards were frequently fully drawn and then repaid during the 2006-2007 period, and it is clear from Simon Consulting's analysis that the Bank received repayments in part comprised of victims' monies.

And yes, the Bennett accounts were very profitable to the Bank.

Banks derive their revenue and income from 4 sources, 2 direct and 2 indirect: 1) bank fees and service charges, 2) interest payments on loans, 3) the spread between what the Bank pays for deposits and what it charges to lend, and 4) the long-term exponential value of new deposits.

Based on Wells Fargo Bank records, we can measure some of these quantities easily. For example, Simon Consulting's calculations show Wells Fargo derived **$563** in fees charged by the Bank from the primary checking account during 2006-2007. But this is only a small fraction of the profitability of this business.

The total interest charges on the lines of credit and the credit cards are not available to us, but on individual monthly statements some of the data helps us see the scale of these revenues for the Bank. For example, the December 2006 statement shows the Bennetts earned **$61.98** in interest on their PMA account for all of 2006 but paid **$14,855.37** in interest on the Reserve line and 2 personal lines of credit for the year.

Based on analysis by Simon Consulting, the lines of credit alone generated **$38,009.08** in interest charges between 2005-2007.

The interest charges and fees on the 3 credit cards are not available for our review, but would be substantial.

We cannot measure the indirect benefits to the Bank without additional books and records. We note that the accounts did receive over $10 million in deposits from outside Wells Fargo, which for banks is a considerable benefit with a significant measurable economic value.  We could measure this benefit with more complete access to the associated data.

**12. Were there transactions or attributes of the accounts that would have required Wells Fargo Bank personnel to intercede or intervene early in the fraud?**

Yes. There are multiple movements of cash and checks that would have triggered alerts for Corporate Security, Fraud, and/or the Anti-Money Laundering unit's investigations.

During several periods, especially during 2006, there is extensive use of ATM machines for very large (often at the maximum daily limit) cash withdrawals, often on sequential

8

days. In addition to these ATM transactions, the Bennetts wrote and cashed, apparently in Wells Fargo Bank branches (the checks clear the account on the same day), several large round-dollar checks payable to "cash," bringing the total cash withdrawal by the Bennetts to $25,800 during the 90-day period October-December 2006.  In my experience, these withdrawals of cash in these patterns and in these amounts would cause a bank investigations unit to open a case in order to investigate the sources and uses of the funds, and to determine if the Bennetts were engaging in a financial crime (money laundering or check kiting, for example).

For example, here is what the Bank would have seen in cash withdrawal by the Bennetts during October-December 2006:

| Date | ATM Withdrawal | Checks to "cash" |
|------|----------------|------------------|
| 10/5/06 | 200.00 | |
| 10/6/06 | 200.00 | |
| 10/16/06 | 400.00 | |
| 10/23/06 | 200.00 | |
| 10/25/06 | 400.00 | |
| 10/27/06 | 300.00 | |
| 10/31/06 | 200.00 | |
| | Month subtotal $1,900.00 | |
| 11/1/06 | 200.00 | |
| 11/6/06 | 200.00 | |
| 11/13/06 | 300.00 | |
| 11/15/06 | 200.00 | |
| 11/24/06 | 500.00 | |
| 11/27/06 | | Check 189 "cash" 6,000.00 |
| 11/29/06 | 400.00 | |

Month subtotal $7,800.00

| 12/4/06 | 400.00 | Check 203 "cash" 6,000.00 |
| 12/13/06 | 400.00 | Check 209 "cash" 4,000.00 |
| | | Check 210 "cash" 2,000.00 |
| 12/15/06 | 200.00 | |
| 12/18/06 | 400.00 | |
| 12/20/06 | 400.00 | |
| 12/22/06 | 300.00 | |
| | 400.00 | |
| 12/26/06 | 800.00 | |
| 12/27/06 | 800.00 | |

Month subtotal $16,100.00

**3-Month total**     **$25,800**   [source: Wells Fargo Bank records]


A second area of activity which would trigger account monitoring and intervention by bank personnel would be the **volume and velocity** of funds moving through the Bennett accounts. From the Simon Consulting analysis of the Bank's account statements, we see over $10 million in deposits were placed in the 8791 account during 2006-2007. All of the deposits were large round dollars (*e.g.,* $100,000.00) and stayed only a few days before being transferred out to Schwab or paid to other investors as commissions or returns. These behaviors are indicators of money laundering, fraud, Ponzi schemes, and/or check kiting, and each would have triggered an alert to cause a unit of the Bank to respond appropriately.

The **velocity of the movements** is also notable. On January 16, 2007, for example, Bennett received a $100,000 deposit from Mr. and Mrs. Casper and made a $100,349.54 electronic payment to American Express the same day. In order for this transaction to be consummated, the Bank had to make the Casper check immediately available to the Bennetts and had to enable the Bennett account to make the instant money transfers to

10

American Express.

**13. To what degree were employees of the Bank required to intercede or intervene to enable the accounts to process their respective transactions?**

Wells Fargo Bank employees had to intercede or intervene to enable the transactions to a very substantial degree.

It is apparent from the Wells Fargo Bank books and records (monthly statements) that there were several instances when a banker had to intervene to assist the Bennetts in their transactions.

Here are some examples:

- In January and February 2007, there were several large, sudden negative balances in the Bennett account that caused the Bennetts to bounce several checks, creating a large number of overdrafts and "NSF" (insufficient funds) charges. Overdrafts are extensions of credit by a bank, so Wells Fargo personnel were required to make a determination that the Bennetts were acceptable credit risks for the shortfall. This required programming and oversight and approval by Wells Fargo managers.

- Included in the list of NSF transactions are January 2007 payments (checks 10266 for $1,847.72 and 10272 for $500.00) to 2 of the Wells Fargo credit cards. These had to be reversed and then repaid to the Bank at a later time. This use of a bad check to pay a debt owed to another part of the Bank would have caused alerts to be sent to the Branch manager and the Customer Service Representative with responsibility for the Bennett's PMA accounts.

- There is at least one instance of Bank charges being reversed, during this same period at the end of January 2007. In my experience, the timing of the reversal suggests one of the Bennetts complained about the NSF and returned check charges, and one charge of $32.00 was reversed on January 27, 2007. This would require approval of a Branch Manager or Assistant Branch Manager.

**14. Assuming the account was examined in _January 2007_, what would have been seen and known?**

January 2007 is an especially interesting period in the Bennett accounts at Wells Fargo, and I believe there were multiple triggers that required the Bank to review the account's health at that time.

In my analysis, the Bank had multiple, redundant reasons to have bank personnel open

11

the Bennett account and analyze the transactions based on the mid-January 2007 negative balance in the primary checking account (8791).

If this were performed, what would the Bank see?

- During January 2007, in the Bennett's primary checking account (8791) was seriously overdrawn on 1/17 through 1/19 causing 10 items to be returned, triggering 13 separate overdraft or NSF fees. Later in the month, one of these overdraft charges is reversed. The negative balance triggered several reversals, caused multiple returned checks, including 2 payments to Wells credit cards. In late January one of the NSF charges is reversed. This is customarily done after a customer complaint.

- A Wells Fargo Bank employee looking at the account activity in mid-January 2007 would see an account under extreme stress: payments were made to American Express for $100,149.54 and there was a $40,000 returned item on 1/26. All available credit lines associated with the account were at their limits. Virtually all (except for 3 of the 25) of the checks are for large round dollar amounts. All of the 3 deposits are large round dollar amounts.

Several classic signs of multiple problems would have been obvious. Scanning the prior year's average balance and flow of funds, the Bank would have seen 23 deposits totaling $1.45 million, all in large round dollars, most from sources who we understand to be early investors in the Ponzi scheme. If the Bank looked at the deposited checks, memo items would have included "loan" (5 times), and multiple deposits from unrelated parties. The Bank would have seen even more checks written to these early investors, in smaller amounts (averaging $6,000), always in large round dollars.

According to the Bank statements, these 2006 deposits and payments to investors are the beginning of the $10,752,500 in deposits into the fraud and the $5,447,450 paid out to investors during the life of the scheme.

To a banker, these are symptoms that the account is **not** an individual retail checking account but rather some sort of financial business or dangerous Ponzi scheme. It would be a violation of the account agreement (between Bennetts and Wells Fargo) and grounds for the Bank to terminate the relationship or force the client to migrate to a business banking account relationship under different supervision.

### 15. What business records does the Bank possess that would help to determine additional knowledge?

Again, as stated elsewhere, we are restricted here to reviewing only the account

12

statements for 2005-2007. The Bank has many, many **internal** business records that would reflect the following:

- Reports created to monitor accounts for financial fraud, money laundering, and check kiting;

- Reports tracking large deposits, large movements of funds, rapid (high velocity) movements of funds, cash movement, and NSF activity;

- The Bank has profitability analysis that shows which accounts the Bank is looking to curtail and which it is intending to grow. These analyses are used for compensating Branch and Bank officers and staff, among other things.

- The Bank's audit, consumer compliance, operations, fraud, security (loss) departments each produce reports designed to ensure safe and profitable operation of the accounts, and to prevent fraud and money laundering and the like.

**16. How would peer banks treat these accounts and transactions?**

In my opinion, other banks would have stopped the Bennetts no later than in early 2007, due principally to the anomalous and irregular transactions that were conducted in the Bennett accounts.  My primary business is advising banks on how to avoid frauds in their retail accounts. No bank wants to be in the position of Wells Fargo in this matter.

**17. Based on what is now available, and in my professional opinion, was the Bank aware of the fraud? Did Wells Fargo Bank have actual knowledge of the fraud?**

I think it is clear from a review of the transactions that Wells Fargo provided extraordinary assistance to the Bennetts, that Bank personnel assisted them in key ways to enable the transactions in and among the accounts, that multiple parts of the Bank were aware of the anomalous and irregular transactions flowing through the Bennett accounts, and that these parts of the Bank (and the Bank's personnel) had sufficient alerts or alarms to stop the transactions as a means of protecting the Bank's reputation, these monies, and the innocent people involved. Based on the materials available at this time, we cannot know if Bank officers met and discussed these transactions with the Bennetts, but we can judge the Bank officers by the actions of the Bank that are apparent on the account statements.

**18. In performing this review, I have reviewed documents including the following:**

1. Judge Campbell's Order of October 15, 2009 on the Wells Fargo Motion to Dismiss

2. Account analysis prepared by Simon Consulting for Galbut & Galbut LLP

3. Account opening for the Alva James Bennett and Deborah Bennett at Norwest in 1996

4. Wells Fargo Business Acct application for James Bennett 9/18/2007

5. Wells Fargo Portfolio Management Accounts including the following accounts:

   - 7479 PMA Prime checking acct

   - 8791 Advantage Plus checking acct (primary)

   - 9441 Wells Fargo Personal Line of Credit

   - 7815 Wells Fargo Reserve Line of Credit

   - 1784 Wells Fargo Personal Line of Credit (primary)

   - 0460 Wells Fargo credit card

   - 8176 Wells Fargo credit card

   - 5547 Wells Fargo credit card

6. I have not reviewed the policies and procedures of Wells Fargo Bank.

7. I have reviewed transcripts and news accounts of the Wells Fargo BSA/AML OCC enforcement action.

19. This affidavit and opinion is based on the material and information I have reviewed as of November 5, 2009. I reserve the right to revise or amend this opinion based on new information or data received subsequent to this.

Dated this 6th day of November, 2009.

_____
Charles Grice

Subscribed and sworn to before me the undersigned Notary Public by Charles Grice this 6th day of November, 2009.

_____
Notary Public

ROBERT LEWIS SHEPARD
COMM. #1821024
NOTARY PUBLIC ● CALIFORNIA
SAN FRANCISCO COUNTY
Comm. Exp. OCT. 31, 2012

My commission expires: Oct. 31, 2012

15

Exhibit A

Charles H. Grice

Work:

CRI Compliance

250 South End Ave Stop 16-B

New York NY 10280

Tel 917 568-0603 direct

Fax 419 828-0788

cgrice@cricompliance.com

Home:

919 New Concord Road

East Chatham NY 12060

**Professional Experience:**

1988-Pres   **CRI Compliance**, Banking/Internal Controls Expert.  Primary areas of expertise: **Internal control, risk management and financial crimes.**  Grice has designed internal control systems for major US and non-US banks, hedge funds, fund of funds, and broker-dealers in accordance with international leading practices, Basel II, etc.

16

- Provided risk management consulting (design, gap analysis, third party audit) around lending, operations, investment banking activities.  Regulatory expertise includes all aspects of the Bank Secrecy Act, anti-money laundering regulations, Know Your Customer and Know Your Transaction; OFAC; USA PATRIOT Act of 2001; Community Reinvestment Act, fair lending laws, and related consumer regulations (e.g., HMDA, Truth in Lending); European, Japanese, Brazilian and Korean banking laws and regulations; and related laws and regulations (tax evasion, insider trading, FCPA).
- Provide consulting advice, develop policies and procedures, train and advise Boards of Directors; train executive staff; develop web-based intranet training curricula.
- Negotiate enforcement actions (C&Ds, MOUs, Board Resolutions) with state and federal banking agencies; supervise compliance programs to prevent or satisfy enforcement actions; negotiate with and testified before staff of U.S. Department of Justice, Federal Reserve Board, U.S. Department of the Treasury, and the Office of Foreign Assets Control (OFAC).
- Advised governments of Brazil, South Korea, Spain and South Africa on domestic legislation, regulation and enforcement regimes.
- Supervise staff in Los Angeles, Chicago, Cleveland and New York.
- Pre-transaction due diligence in commercial and mortgage banking.
- Due diligence standards -- perform research on best practices and leading practices for commercial and investment banks.
- Regulatory relations, negotiate settlements with troubled banks and thrifts.
- Capital plans, recapitalizations, OTS and OCC-ordered restoration.

Teaching

Since 1988, have taught multi-bank seminars on mortgage lending risk management and compliance, operational risk controls, and financial crimes in 36 states to over 4500 banks, and Brazil, Greece, UK, Switzerland, Singapore, Hong Kong, Italy, China, Japan, Macau, Puerto Rico, South Africa, South Korea, Spain and Taiwan. Provide detailed training to the central banks and financial intelligence units of large US and global banks as well as the government financial intelligence offices of Brazil, Japan, Russia, South Korea, and Spain.

Provide extensive on-site training to Boards of Directors, executive officers, and staff on risk management, compliance and operational risk to banks and mortgage companies throughout US and North America, including First

17

Interstate Bank, US Bank, Bank of New York, Bank of America, Bank of Nova Scotia, and Washington Mutual Bank.

Regularly (20-30 times per year) deliver 2-4 hour seminars on fraud, Ponzi schemes, and related financial crimes. Grice has delivered these seminars for global and regional banks, the California Bankers Association, the American Bankers Association, RMA, and the International Bankers Association.   In addition, Grice has delivered detailed training to the staff of the Fed, OCC, OFAC and the IRS Criminal Division.

**Internal Investigations**

Assisted in extensive transactional analysis, provided "best practices" consulting, and served as consulting and testifying expert on criminal and civil matters growing out of high profile fraud and operational risk management cases from 1996 to 2009.

Provided consulting to clients of several nationally and internationally prominent law firms on discreet pre-transaction matters, including independent analysis of investment banking proposals, valuation, and evaluation of key executives.

Coordinated investigation and served as consulting and testifying expert in litigation arising from multi-billion dollar fraud in Miami, Florida.

Regularly perform internal investigations of employees, officers, directors and prominent clients for the purposes of due diligence and enhanced due diligence; recommend if a report to law enforcement or SAR should be completed, and to determine if internal policy or procedure has been violated.

**Other Engagements**

- Analyzed and reviewed activities of securities broker accused of violating industry best practices and internal compliance guidelines and policies. Prepared report and was deposed in preparation for litigation.

- Reviewed SEC asset freeze orders and testified in federal court regarding abilities of US banks to execute such freezes. Analyzed bank operating systems for investigating and reporting Ponzi scheme and similar frauds.

- Reviewed complex financial institutions related to suspicious insurance and financial transactions by broker-dealer employees of large insurance firm. Prepared extensive reports for counsel and presented findings to NASD arbitration panel.

- Reviewed complex financial transactions for a diversified financial holding company on suitability, speculative sales, and possible violations of internal compliance policies and procedures (including gift and bribery prohibitions). Report prepared in preparation for litigation.

- Analyzed complex financial transactions by a senior officer of a U.S. bank involving several prominent clients, the CEO, and residents of Taiwan and China. Provided report and recommendations to prosecutors and the Board of Directors regarding next steps.

- Analyzed and reviewed suspicious employee transactions benefiting clients to determine if the conduct violated NASD and SEC guidance, AML rules, and internal policy and procedures. Report prepared for counsel in anticipation of federal litigation.

- Assisted executive management of US mortgage banking company in investigating and responding to allegations of predatory lending; coordinated analysis of data and provided consulting expertise to legal counsel; provided testimony to investigators for US Department of Justice and Federal Trade Commission.

- Analyzed complex financial transactions by a bank client alleged to a have defrauded her supervisor of $21 million through loan fraud/ponzi scheme. Prepared a report in preparation for litigation.

- Analyzed mortgage banking operations for nationwide lender; developed strategies for capital plan; negotiated with OTS and FDIC on enforcement actions; worked through legal counsel for restructuring agreement, resolution.

- Served as consulting and testifying expert on a complex, prominent international bank fraud (on-going).

- Served as consulting expert to international bank and law firm on the Newby Enron litigation.

- Advising Korean, Japanese, Brazilian and Taiwanese banks on lending operations, "best practices," and compliance with US laws and regulations.

- Providing advice and consulting to Russian Central Bank; holding seminars for bank examiners on operational risk, risk management and compliance.

2004-2006    Kroll, Managing Director, Global Head of Financial Services Risk Consulting, New York. Directed global and U.S. compliance and investigative work of global risk management firm. Supervised teams in Tokyo, London, Hong Kong, Buenos Aires, and Madrid.  Responsible for all aspects of growing global financial services practice, performing quality control on work product, interacting with clients, interacting with government agencies in the U.S. and abroad. [Full-time at Kroll 2004 through 2006; on retainer since for work outside the US]

1986-87    California Bankers Association, Assistant Director, San Francisco CA. Worked on FIRREA and S&L crisis; advised 300 California bank CEOs on issues arising from real estate and mortgage crisis; consulted extensively with FDIC, Federal

Reserve, OCC and OTS on restructuring issues, regulatory and legislative responses. Managed task forces of bank CEOs on M&A, legislative and trust matters.

1980-82    <u>Federal Reserve Board</u>, International Finance Division, Washington, D.C. Responsible for special projects for Fed Chairman Paul Volcker related to interest rate management, risk management, and US central bank's relationships with institutions in Spain and Portugal; provided monitoring and reported on certain policy issues to the Board of Governors. Top Secret Clearance.

1979-80    <u>U.S. Senator Lloyd Bentsen</u>, Legislative Analyst, Committee on Housing, Banking and Urban Affairs, Washington, D.C.

Short-term/Summer Jobs:

<u>Bankers Trust</u> (1984) – Provided analysis of mortgage banking investments, including portfolio and whole-loan acquisitions

<u>Mondale for President</u> (1983) – speechwriter for presidential campaign.

<u>Johns Hopkins Credit Union</u> (1979) – Assisted on mortgage lending production and operational tasks.

<u>Texas State Senate</u> (1978) – Wrote legislative proposal on mortgage finance program designed to increase investment in lower income areas of State.

Education:

1988-92    Kellogg National Fellow, W.K. Kellogg Foundation, Battle Creek MI. Three-year, part-time fellowship. One of 40 Fellows selected from the U.S. to pursue 3-year interdisciplinary study on mortgage investment alternatives in low-income areas. Performed research with/for governments in Brazil, Poland, South Africa, Russia,

21

Italy, Chile, China, Japan, and India.

1983-85     Master of Public Policy, John F. Kennedy School of Government, Harvard University. Advanced courses at Harvard Business School and Harvard Law School, Cambridge, MA. Master's thesis on the financing of domestic terrorism was directly supervised by James Vorenberg, Dean, Harvard Law School, for the client, the Assistant Director of the FBI.

1982-83     ITT Scholar/Fulbright Scholar in Brazil. Taught and performed research at the Getulio Vargas Foundation, Rio de Janeiro, Brazil and Brazilian Capital Markets Association. Examined how financial markets of Brazil could be streamlined to promote bank lending.

1980-82     Masters Program (ABD), Economics, George Washington University, Washington, D.C. Focus on methods to promote bank lending in low-income areas of US and abroad.

1977-80     BA, International Studies, Johns Hopkins University.  Completed BA in less than three years; JHU Alumni Fellow. 1979-1980 in residence at the School of Advanced International Studies, Washington, D.C.

1978        Summer Program, University of Texas Law School, Austin, Texas.

**Honors:**

22

Kellogg National Fellow

ITT Fellow

Fulbright Scholar

National Community Leadership Award, US Chamber of Commerce