1  **WO**

2

3

4

5              **IN THE UNITED STATES DISTRICT COURT**

6                **FOR THE DISTRICT OF ARIZONA**

7

8   Barry L. Stern, M.D. and Judy Stern,        )    No. CV-09-1229-PHX-DGC
    husband and wife; and Barry L. Stern as     )
9   trustee for the Urology Clinic Ltd Profit   )
    Sharing Plan, dated April 8, 1991,          )
10                                              )
                    Plaintiffs,                 )
11                                              )
    vs.                                         )    **ORDER**
12                                              )
                                                )
13  Charles Schwab & Co., Inc., a foreign       )
    corporation; Wells Fargo Bank, N.A., a      )
14  foreign corporation,                        )
                                                )
15                  Defendants.                 )
                                                )
16  _____    )

17

18          Plaintiffs Barry and Judy Stern and the Urology Clinic Ltd Profit Sharing Plan have

19  sued Defendants Charles Schwab & Co., Inc. and Wells Fargo Bank, N.A. for negligence and

20  aiding and abetting various torts.  Defendant Schwab has filed a motion for judgment on the

21  pleadings of Plaintiffs' second amended complaint.   Dkt. #33.  Defendant Wells Fargo has

22  filed a motion to dismiss the second amended complaint for failure to state a claim. Dkt. #47.

23  Both motions are fully briefed.  Dkt. ##46, 52, 53, 54.  The Court held oral argument on

24  March 17, 2010.  For reasons that follow, the Court will grant both motions.[1]

25

26  _____

27          [1]Plaintiffs' memoranda do not comply with Local Rule of Civil Procedure 7.1(b)(1)'s
    requirement that all papers be in 13 point type, including footnotes.  Plaintiffs' counsel
28  should comply with this rule in all future filings in this Court.

# I.    Background.

Between April and August of 2007, the Sterns invested almost two million dollars with Deborah Cheryl Bennett, a woman, they allege, who was unemployed, not a registered securities dealer, and had no significant investment experience. Dkt. #39 at ¶ 98. The Sterns wrote personal checks totaling $1,915,000 to Mrs. Bennett because she promised them returns of 20 to 30% per month – 240 to 360% per year – by trading in the stock market. *Id.* at ¶ 18. The Sterns lost all but $105,000 of their money. Dkt. #39-3 at 6.

The Sterns do not sue Mrs. Bennett in this case. Not surprisingly, she is in bankruptcy and under investigation by various state and federal authorities. Dkt. #39 at ¶¶ 38-40, 120. Rather, the Sterns sue Wells Fargo, the bank where Mrs. Bennett maintained the account through which most of the money passed, and Schwab, the investment firm Mrs. Bennett used to make her stock market trades. The Sterns allege that Wells Fargo and Schwab were negligent in failing to stop Mrs. Bennett's fraud and aided and abetted her various torts. This case presents the question of whether a bank and an investment firm, under Arizona law, have a duty to protect third parties from fraud committed by the bank's and investment firm's customer, and whether Defendants had sufficient knowledge of Mrs. Bennett's fraud to give rise to liability for aiding and abetting.

The Court has confronted these issues before. The Court previously dismissed the allegations against Wells Fargo for failure to state a claim. *See Stern v. Charles Schwab & Co.*, CV-09-1229-PHX-DGC, 2009 WL 3352408 (D. Ariz. Oct. 16, 2009). The Sterns filed a second amended complaint, which Defendants now ask the Court to dismiss or adjudge on the pleadings.

## II.    Legal Standard.

### A.    Failure to State a Claim.

When analyzing a complaint for failure to state a claim under Rule 12(b)(6), "[a]ll allegations of material fact are taken as true and construed in the light most favorable to the non-moving party." *Smith v. Jackson*, 84 F.3d 1213, 1217 (9th Cir. 1996). "To avoid a Rule 12(b)(6) dismissal, a complaint need not contain detailed factual allegations; rather, it

must plead 'enough facts to state a claim to relief that is plausible on its face.'" *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). "The plausibility standard . . . asks for more than a sheer possibility that a defendant has acted unlawfully," demanding instead sufficient factual allegations to allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, --- U.S. ---, 129 S. Ct. 1937, 1949 (2009) (citing *Twombly*, 550 U.S. at 556). "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.* at 1950 (citing Fed. R. Civ. P. 8(a)(2)).

The Court may not assume that a plaintiff can prove facts different from those alleged in the complaint. *See Associated Gen. Contractors of Cal. v. Cal. State Council of Carpenters*, 459 U.S. 519, 526 (1983); *Jack Russell Terrier Network of N. Cal. v. Am. Kennel Club, Inc.*, 407 F.3d 1027, 1035 (9th Cir. 2005). Similarly, legal conclusions couched as factual allegations are not given a presumption of truthfulness, and "conclusory allegations of law and unwarranted inferences are not sufficient to defeat a motion to dismiss." *Pareto v. F.D.I.C.*, 139 F.3d 696, 699 (9th Cir. 1998); *see also Iqbal*, 129 S. Ct. at 1949 ("Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice.") (citation omitted).

**B.      Judgment on the Pleadings.**

A motion for judgment on the pleadings under Rule 12(c) is decided under the same standards as a Rule 12(b)(6) motion. *McGlinchy v. Shell Chem. Co.*, 845 F.2d 802, 810 (9th Cir. 1988).

**III.   Negligence.**

Wells Fargo and Schwab ask the Court to dismiss the negligence claims on the ground that neither of them owed a duty to the Sterns. The tort of negligence requires that the defendant owed the plaintiff a duty. *Gipson v. Kasey*, 150 P.3d 228, 230 (Ariz. 2007). Whether a duty exists is decided by the Court as a matter of law. *Id.*

## A.    Wells Fargo.

The Sterns contend that Wells Fargo owed them a duty for three reasons: (1) the Sterns were customers of Wells Fargo, (2) Wells Fargo had actual knowledge of Mrs. Bennett's fraud, and (3) public policy supports a duty. Dkt. #53 at 3-13. The Court finds none of these arguments persuasive.

### 1.    Customer Relationship.

The Sterns contend that they too were customers of Wells Fargo at the time of Mrs. Bennett's fraud and, because of that relationship, Wells Fargo owed them a duty to "disclose the irregular, illegal and fraudulent activity" in Mrs. Bennett's account or to "approve, supervise, and control" Mrs. Bennett's account. Dkt. #39 at ¶¶ 182, 184. Significantly, the Sterns do not allege that their accounts were the same as Mrs. Bennett's account, that their accounts and Mrs. Bennett's account were opened in connection with each other, or that Wells Fargo understood the accounts to be connected. Rather, they simply allege that they banked at Wells Fargo at the same time that Mrs. Bennett used her separate Wells Fargo account to perpetrate the fraud. *Id*. at ¶¶ 11-15.

Under Arizona case law, the relationship between a bank and an ordinary customer is no more than that of debtor and creditor. The relationship does not give rise to a fiduciary duty. *McAlister v. Citibank (Arizona)*, 829 P.2d 1253, 1258 (Ariz. App. 1992). Taking the facts in the light most favorable to the Sterns, nothing more than an ordinary banking relationship existed at the time of the fraud. The Sterns originally did their banking with Norwest, but Norwest merged with Wells Fargo in 1998. Dkt. #39 at ¶ 11. At the time of their dealings with Mrs. Bennett in 2007, the Sterns had one line of credit and two brokerage accounts with Wells Fargo. *Id*. at ¶ 13-14. This relationship did not give rise to a fiduciary or special duty under Arizona law. *McAlister*, 829 P.2d at 1258. Arizona courts have found a fiduciary duty between a bank and a customer only one time, when "(1) the bank acted as the customer's financial advisor for many (twenty-three) years, and (2) the customer relied upon the bank's financial advice." *Id*. When a plaintiff is simply a bank customer, Arizona

courts hold "as a matter of law [that] no fiduciary relationship exist[s]." *Id*. The Sterns do not allege that Wells Fargo acted as their financial advisor.

The Sterns assert other facts in support of a fiduciary duty. They argue that they "bought a building from Wells Fargo in 2002, maintained personal and business bank accounts with Wells Fargo until about 2003, continued to receive account statements from Wells Fargo on a line of credit through 2008, maintained personal and brokerage accounts with Wells Fargo, two of which were not closed until early 2008 and 2009, and, to this day, continue to receive online newsletters from Wells Fargo sent to its customers." Dkt. #53 at 4. Taken as true, these additional facts merely show that the Sterns maintained a banking relationship with Wells Fargo. The fact that they bought a building from Wells Fargo, with funds provided by another bank (Dkt. #39 at ¶ 13), adds nothing to their duty argument.

The Sterns cite *Kesselman v. National Bank of Arizona*, 937 P.2d 341 (Ariz. App. 1997), for the proposition that a simple customer relationship is sufficient to create a duty of disclosure. In *Kesselman*, a company sought financing from National Bank of Arizona for a real estate project. A loan officer at the bank informed the company that the bank could not finance the project, and referred the company to mortgage lenders who might wish to provide financing. The mortgage lenders decided to loan money to the company. Escrow services for the loan closing were to be handled by Charter Title, an agency that had numerous accounts at National Bank. National Bank suspected Charter Title of check kiting, but did not tell the mortgage lenders of this suspicion. Charter Title kited several checks during the escrow process and, as a result, the mortgage lenders suffered losses. The mortgage lenders later sued National Bank, arguing that the bank owed them a "duty to take affirmative measures to avoid any loss to them caused by Charter Title's check kiting." *Id.* at 344. The Arizona Court of Appeals disagreed and held that the Bank owed no duty to the mortgage lenders.

Contrary to the Sterns' argument, *Kesselman* does not stand for the proposition that a duty of disclosure automatically exists between a bank and its customer. *Kesselman* did not hold that such a duty exists. Rather, the Sterns rely on dictum in *Kesselman*'s discussion

of *Dodd v. Citizens Bank*, 272 Cal.Rptr. 623 (Cal. App. 1990), a case applying California law. *Kesselman* stated that *Dodd* "implicitly stands for the proposition that absent a customer or other special relationship, a bank does not owe a duty of disclosure, even when its customer is a fiduciary." *Kesselman*, 937 P.2d at 346. *Kesselman* made this statement in explaining why *Dodd* did not support the mortgage lenders' claim that National Bank owed them a duty, but *Kesselman*'s distinguishing of *Dodd* is not the same as its adoption of *Dodd* as the law of Arizona. *Kesselman*'s dictum is simply too thin a reed upon which to hang the duty claimed by the Sterns. *McAlister* provides more direct authority.

Moreover, if the Court were to look to *Kesselman*'s dicta for guidance, the more probative dicta would be found in *Kesselman*'s discussion of three other non-Arizona cases and their common holding that a bank's direct involvement with a third party in the very transaction that gave rise to the litigation "satisfied the necessary relationship giving rise to the duty of disclosure." *Id*. at 345. Wells Fargo was not directly involved in any transactions between the Sterns and Mrs. Bennett.

Finally, the Court notes that the Arizona Supreme Court has described *Kesselman* as holding that no duty arises "absent a special relationship between the bank and the investors." *Wells Fargo Bank v. Ariz. Laborers, Teamsters and Cement Masons Local No. 395 Pension Trust Fund*, 38 P.3d 12, 22 (Ariz. 2002) (*Arizona Laborers*). The Arizona Supreme Court made no suggestion that *Kesselman* creates a duty merely from a customer relationship.

### 2. Actual Knowledge of Fraud.

The Sterns argue that Wells Fargo had a duty to disclose Mrs. Bennett's fraud because it had actual knowledge of their fraudulent activities. In support, the Sterns cite *Arizona Laborers*, which, they contend, held that "a duty to disclose may arise in 'special circumstances,' including when a bank has actual knowledge of a customer's fraudulent activities." Dkt. #53 at 5 (quoting *Arizona Laborers*, 38 P.3d at 22-23).

*Arizona Laborers*, however, was not a negligence case. It concerned intentional torts. The Arizona Supreme Court specifically noted that negligence-based claims and their

"predicate legal duty" were "not applicable to the intentional tort claims" before it. 38 P.3d at 22. While it is true that *Arizona Laborers* discussed the duty that may arise from actual knowledge, it did so in the context of intentional tort claims only, ultimately concluding that "it was error for the lower courts to dismiss all of the Funds' intentional tort claims by . . . relying on the Bank's alleged lack of duty to make disclosure." *Id*. at 23.

This Court must look to Arizona negligence law to determine whether a duty exists in this case. Duty as an element of negligence was discussed recently by the Arizona Supreme Court in *Gipson*. The Supreme Court provided this relevant guidance:

> A fact-specific analysis of the relationship between the parties is a problematic basis for determining if a duty of care exists. *The issue of duty is not a factual matter; it is a legal matter to be determined before the case-specific facts are considered.* Accordingly, this Court has cautioned against narrowly defining duties of care in terms of the parties' actions in particular cases. "[A]n attempt to equate the concept of 'duty' with such specific details of conduct is unwise," because a fact-specific discussion of duty conflates the issue with the concepts of breach and causation. Thus, the court of appeals erred in focusing on the facts of the particular relationship between Kasey and Followill in determining if a duty exists.

*Gipson*, 150 P.3d at 232 (citations omitted, emphasis added).

This explanation makes clear that a court applying Arizona law should not consider the facts of a particular case when deciding duty. *See also Markowitz v. Ariz. Parks Bd.*, 706 P.2d 364, 366 (Ariz. 1985); *Coburn v. City of Tucson*, 651 P.2d 1078, 1080 (Ariz. 1984). That includes facts concerning Wells Fargo's alleged knowledge of Mrs. Bennett's fraud. While those facts might be relevant to prove breach if a duty is found to exist, they are not to be considered in deciding whether a duty exists in the first instance. *Gipson*, 150 P.3d at 232. Duty is "is a legal matter to be determined before the case-specific facts are considered." *Id*.

### 3. Public Policy.

Finally, the Sterns argue that public policy supports a finding that Wells Fargo owed them a duty. The duty advocated by the Sterns is extraordinarily broad. The Sterns would have the Court hold that banks (and investment firms) whose customers defraud third persons have a duty to those third persons to detect and prevent the customers' fraud. Such a duty

would transform banks and investment firms into fraud police, duty-bound to detect and reveal fraud that might be committed by one of their thousands of customers on some unknown third persons, holding the banks and investment firms financially liable for the losses suffered by those third persons.

The Sterns cite no Arizona case that has recognized such a far-reaching duty. Instead, they cite various Arizona criminal statutes prohibiting securities fraud and other wrongs, arguing that the Court should impose a duty on Wells Fargo based on those statutes. The Court previously rejected this argument:

> The Sterns argue that several Arizona statutes prohibiting securities fraud, consumer fraud, and racketeering create a duty between Wells Fargo and the Sterns. The Sterns also refer to federal money laundering statutes and even the Patriot Act. These state and federal statutes could create a negligence duty under *Gipson*, however, only if Wells Fargo violated them. Wells Fargo is not accused of securities fraud, consumer fraud, or money laundering, and the Sterns do not allege that Wells Fargo violated the Patriot Act. Rather, Wells Fargo stands accused in this case of failing to detect fraudulent activity in one of its customer's accounts and failing to close the accounts or disclose the activity to law enforcement. The Sterns cite no statute that makes such conduct criminal as required in *Gipson*.

> The Sterns assert that Wells Fargo had an obligation to file suspicious activity reports under federal and state law. But in addition to the fact that the statutes cited by the Sterns are not criminal, the Sterns make no attempt to show that the statutes are designed to protect the Sterns and other similarly situated persons from the type of harm that resulted from the Bennetts' fraud. *Gipson*, 150 P.3d at 233. Moreover, as Wells Fargo notes, these statutes require that suspicious activity reports filed with the government be kept confidential. *See* A.R.S. § 6-1241(O); 31 U.S.C. § 5318(g). Numerous courts have held that they do not give rise to private rights of action. *See, e.g., S. Appalachian Coal Sales v. Citizens Bank of N. Ky.*, 2008 WL 4467297, *11 n.15 (E.D. Ky. 2008); *Carran v. Morgan*, 2007 WL 3520480, *5 (S.D. Fla. 2007); *Commerce Bank/Penn. v. First Union Nat'l Bank*, 911 A.2d 133 (Pa. Super. Ct. 2006).

*Stern*, 2009 WL 3352408 at *6.

In their second amended complaint, the Sterns do allege that Defendants failed to report to the Arizona Attorney General certain monetary transactions that reflected Mrs. Bennett's violation of criminal money laundering laws. Dkt. #39 at ¶ 185(iv)-(v). But monetary transaction reporting laws generally are intended to aid law enforcement in detecting and preventing criminal activity. *See* A.R.S. § 6-1242 (authorizing Attorney General to investigate whether any person is engaged in money laundering); *State ex rel.*

- 8 -

*Goddard v. W. Union Fin. Servs., Inc.*, 166 P.3d 916, 927 (Ariz. App. 2007) (purposes of A.R.S. §§ 6-1241, 6-1242 are to enable Attorney General to investigate money laundering). The duty imposed on Wells Faro by such statutes is to the State of Arizona, not to the Sterns. To conclude that such a duty can be expanded to create a tort duty to the Sterns – in effect, to all those who might have been harmed by the money laundering, or the crime underlying the money laundering – would be to recognize a duty far more expansive than that recognized in the monetary reporting laws themselves. The Restatement (Second) of Torts § 288 has made clear that a court "will not adopt as the standard of conduct . . . the requirements of a legislative enactment . . . whose purpose is found to be exclusively (a) to protect the interests of the state." The comments on this section of the Restatement are instructive:

> Many legislative enactments and regulations are intended only for the protection of the interests of the community as such, or of the public at large, rather than for the protection of any individual or class of persons. Such provisions create an obligation only to the state . . . . The standard of conduct required by such legislation or regulation will therefore not be adopted by the court as the standard of a reasonable man in a negligence action brought by the individual.

Restatement (Second) of Torts § 288 cmt. b.

In light of these principles, the Court will not impose the broad duty advocated by the Sterns absent some clear indication that Arizona courts recognize such a duty. The Sterns have cited no such Arizona authority, and *Gipson* suggests a more modest approach. *Gipson* recognizes that "[n]ot all criminal statutes . . . create duties in tort." 150 P.3d at 233. It holds that "[a] criminal statute will establish a tort duty *only* if the statute is designed to protect the class of persons, in which the plaintiff is included, against the risk of the type of harm which has in fact occurred as a result of its violation." *Id*. (emphasis added, quotation marks and brackets omitted). Similarly, the Restatement makes clear that a court should only adopt a legislative standard as imposing a duty only when "it is acting to further the general purpose which it finds in the legislation." Restatement (Second) of Torts § 286 cmt. d. Not only are the monetary reporting statutes cited by the Sterns not criminal, but they also clearly establish a duty to the state, not to unknown third parties. The Sterns have not shown that they are

- 9 -

among the class of persons the reporting statutes are intended to protect, nor that the harm the Sterns suffered – fraud by Mrs. Bennett – is the harm that results when banks fail to make reports to the Attorney General. The harm in *Gipson* was much more directly a result of the Defendant's action and the statute's violation. The defendant in *Gipson* provided prescription drugs that caused the plaintiff's death. The statue that gave rise to the defendant's duty prohibited precisely that action – distributing prescription drugs. *Id*. No similarly direct connection exists between the statutory requirement that Wells Fargo send reports to the Attorney General and the harm suffered by the Sterns when they were defrauded by Mrs. Bennett.

In summary, the Sterns have not shown as a matter of Arizona law that Wells Fargo owed them a duty. In the absence of duty, there can be no claim for negligence. *Id*. at 230.

**B.    Schwab.**

The Sterns allege that Schwab owed them a duty to "approve, supervise, and control" Mrs. Bennett's accounts and "to abide by prevailing laws, public policy, and industry standards." Dkt. #39 at ¶ 184. In addressing the question of Schwab's duty, the parties focus their attention on several cases from other jurisdictions, including *Bear, Stearns & Co. v. Buehler*, 432 F. Supp. 2d 1024 (C.D. Cal. 2000), *Rolf v. Blyth, Eastman Dillon & Co.*, 637 F.2d 77 (2d Cir. 1980), *Congregation of the Passion v. Kidder Peabody & Co.*, 800 F.2d 177 (7th Cir. 1986), and *Software Design and Application, Ltd. v. Hoefer & Arnett, Inc.*, 56 Cal.Rptr.2d 756 (Cal. App. 1996). None of these cases applies Arizona law.

While discussing these cases, the Sterns argue that "there must be a *fact intensive* inquiry" to determine whether a duty exists on the part of Schwab, and that judgment on the pleadings is not appropriate when such factual issue must be resolved. Dkt. #46 at 5 (emphasis in original). As explained above, however, the Arizona Supreme Court has eschewed a fact-specific determination of duty. Arizona law holds that "[t]he issue of duty is not a factual matter; it is a legal matter to be determined *before* the case-specific facts are considered." *Gipson*, 150 P.3d at 232 (emphasis added); *see also Markowitz*, 706 P.2d at 366; *Coburn*, 651 P.2d at 1080. If the Court is true to Arizona law, it cannot find a duty in

this case by evaluating the detailed facts set forth in the Sterns' brief. The Court must look to broader principles and decide the issue as a matter of law.[2]

The second amended complaint identifies a number of Arizona statutes prohibiting securities fraud, consumer fraud, racketeering, and money laundering. Dkt. #39 at ¶ 185(i)-(v). The Sterns allege that Mrs. Bennett, not Schwab, violated each of these statutes. *Id.* Assuming these allegations to be true, the public policy reflected in the criminal statutes is that individuals in the position of Mrs. Bennett should not act to defraud individuals in the position of the Sterns in the manner proscribed by the statute. The statutes do not criminalize the alleged actions of Schwab – failing to intervene to stop Mrs. Bennett's fraud – and therefore do not reflect a public policy that imposes a duty on Schwab. Without clear support in Arizona law, the Court cannot conclude that the public policy reflected in an Arizona criminal statute creates a tort duty not only for persons who violate the statute, but also for all persons who know of the violation. The Sterns provide no clear support for this proposition.

As noted above, the Sterns do allege that Defendants failed to report to the Arizona Attorney General certain monetary transactions that reflected Mrs. Bennett's violation of criminal money laundering laws. *Id.* at ¶ 185(iv)-(v). For the reasons explained above, however, the Court does not conclude that a duty to report financial transactions to the State of Arizona can be expanded to create a tort duty to all of the unknown persons who might be harmed by the criminal actions of the person whose transactions should have been supported. The Sterns have provided no authority to suggest that Arizona courts would recognize such a broad duty.[3]

_____

[2] The Sterns do not assert, as they did against Wells Fargo, that a fiduciary relationship existed between them and Schwab. Nor could they, given that they were not customers of Schwab.

[3] The Sterns cite various other alleged sources of duty, including stock exchange rules, Wells Fargo ethical guidelines, Schwab internal manuals, and general federal laws. Dkt. #39 at ¶¶ 43-45, 78. They cite no Arizona authority to support their claims that these sources give rise to a negligence duty under Arizona law.

The Sterns have not shown, as a matter of Arizona law, that Schwab owed a duty to them. As a result, Schwab is entitled to judgment on the pleadings on the negligence claim.

**IV.    The Aiding and Abetting Claims.**

To state a claim for aiding and abetting, the Sterns must plead three elements: (1) Mrs. Bennett committed a tort that caused injury to the Sterns, (2) Defendant knew Mrs. Bennett's conduct constituted a tort, and (3) Defendant substantially assisted or encouraged Mrs. Bennett in the achievement of the tort. *Arizona Laborers*, 38 P.3d at 23. Wells Fargo and Schwab argue that the Sterns have failed to plead facts sufficient to establish the second and third elements – knowledge and substantial assistance. Because the Court concludes that the Sterns have failed to plead facts showing knowledge, it need not address substantial assistance.[4]

**A.    The Arizona Requirement of Actual Knowledge.**

The Arizona Supreme Court has stated that "'aiding and abetting liability is based on proof of scienter . . . the defendants must *know* that the conduct they are aiding and abetting is a tort.'" *Id.* (quoting *Witzman v. Lehrman, Lehrman & Flom*, 601 N.W.2d 179, 186 (Minn. 1999) (ellipsis and emphasis in original)). As this Court previously noted, "mere knowledge of suspicious activity is not enough." *Stern*, 2009 WL 3352408 at *7. "The defendant must be aware of the fraud." *Id.* (citing *Dawson v. Withycombe*, 163 P.3d 1034 (Ariz. App. 2007)).

The Arizona Supreme Court's decision in *Arizona Laborers* provides a guide to the level of knowledge required for aiding and abetting liability. In *Arizona Laborers*, the defendant bank entered into a tri-party agreement with Symington (the alleged wrongdoer)

---

[4] In six separate counts, the Sterns allege that Wells Fargo and Schwab aided and abetted Mrs. Bennett's fraud, breach of fiduciary duty, and securities fraud. Dkt. #39 at ¶¶ 123-179. The Court concludes that the knowledge requirement is the same for all of these claims: Defendants must be shown to have had actual knowledge of the tort they are alleged to have aided and abetted. For the sake of simplicity, the Court will address aiding and abetting fraud in the text of this order. The Court's reasoning applies as well to the claims for aiding and abetting breach of fiduciary duty and securities fraud, which are based on the same facts as the fraud claim. *Id.*

and the plaintiff pension funds ("Funds"). Under the agreement, the bank would lend money to Symington for a construction project, and the Funds would provide Symington with permanent financing for the project that would repay the bank's loan. 38 P.3d at 17-18. The Funds later sued the bank for aiding and abetting Symington's fraud on them. In finding sufficient circumstantial evidence to conclude that the bank had "actual knowledge" that Symington was defrauding the Funds, the Arizona Supreme Court relied on these facts, among others: the bank knew Symington had a duty under his agreement with the Funds to provide accurate financial information to the Funds; the bank knew Symington was using false financial statements; the bank knew Symington was in financial trouble on another development that involved the bank, but did not involve the Funds; the bank knew Symington was representing that he had access to securities to which he actually had no access; the bank knew Symington was overstating the value of his real estate holdings; the bank knew Symington was asserting that there was no prospect of litigation, when in fact he was facing litigation on other projects; and the bank knew Symington was making these misrepresentations concerning his financial condition as the time for the Funds' permanent financing approached – permanent financing that would repay the bank's loan. *Id*. at 24-26. The Arizona Supreme Court held that "[t]his accumulation of evidence raises the inference that the Bank *knew* Symington was engaged in false representations to the Funds." *Id*. at 26 (emphasis added). This finding of actual knowledge led the Supreme Court to hold that the bank could be liable to the Funds, its co-party in the tri-party agreement. *Id*.

This knowledge requirement has been confirmed in subsequent Arizona cases. As this Court explained in its earlier ruling:

> Arizona cases applying the scienter requirement of *Arizona Laborers* make clear . . . that mere knowledge of suspicious activity is not enough. The defendant must be aware of the fraud. In *Dawson v. Withycombe*, 163 P.3d 1034 (Ariz. App. 2007), the Arizona Court of Appeals held that knowledge of a defrauder's poor financial condition or dishonesty was not enough to satisfy the scienter requirement for aiding and abetting: "That Turner and Withycombe were aware of Futech's financial condition and of Goett's dishonest character, and were aware that he was soliciting funds from Dawson, indicates poor judgment and risky business practices. It does not, however, rise to the level of scienter required for aiding and abetting, specifically that they were *aware* that Goett *did or would in fact* use fraudulent statements as

- 13 -

a means of procuring the loan." *Id.* at 1053 (emphasis in original). *Dawson*, which applied the language from *Arizona Laborers* upon which the Sterns rely, thus makes clear that suspicion is not enough. The aiding and abetting defendant must be aware of the fraud. This holding comports with the statement in *Arizona Laborers* that the defendant must have "'general awareness' *of the customer's fraudulent scheme*." 38 P.3d at 26 (emphasis added).

*Stern*, 2009 WL 3352408 at *7.

The Sterns argue for a different legal standard. They contend that a reckless disregard for fraud is sufficient scienter for aiding and abetting. In support, they cite three non-Arizona cases: *Levine v. Diamanthuset, Inc.*, 950 F.2d 1478, 1483 (9th Cir. 1991) (applying California law); *In re Am. Cont'l Corp.*, 794 F. Supp. 1424, 1434 (D. Ariz. 1992) (applying federal law); *Fraternity Fund Ltd. v. Beacon Hill Asset Mgmt., LLC*, 479 F. Supp. 2d 349, 368 (S.D.N.Y. 2007) (applying New York law). This Court must follow Arizona law. *Arizona Laborers* makes clear that knowledge of the fraud is required. 38 P.3d at 23, 26. *Dawson* confirms this requirement. 163 P.3d at 1053. The Court will not accept the Sterns' invitation to adopt of version of aiding and abetting broader than Arizona allows.

## B. Wells Fargo.

The Sterns allege that Wells Fargo "knew of, had actual knowledge of, and/or was generally aware of . . . the Bennetts' fraudulent Ponzi scheme." Dkt. #39 at ¶ 7. As the United States Supreme Court has made clear, such a conclusory allegation will not overcome a motion to dismiss. In *Iqbal*, the plaintiff alleged that the defendants "knew of, condoned, and willfully and maliciously agreed to" violate his constitutional rights. 129 S. Ct. at 1951. The Supreme Court held, however, that "[t]hese bare assertions, much like the pleading of conspiracy in *Twombly*, amount to nothing more than a 'formulaic recitation of the elements' of a constitutional discrimination claim[.]" *Id.* (quoting *Twombly*, 550 U.S. at 555). "As such," the Court explained, "the allegations are conclusory and are not entitled to be assumed true." *Id.* Rather, a court must "consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Id.* Applying this teaching from *Iqbal*, the Court must look to the facts alleged in the Sterns' second amended complaint to determine if the knowledge requirement of aiding and abetting has been pled. The Court

must determine whether the complaint "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id*. at 1949.

The Sterns contend that the following circumstantial facts are sufficient to show Wells Fargo knew of Mrs. Bennett's fraud:

> (1) Dr. Bennett was a retired physician, Ms. Bennett was an unemployed housewife, neither were licensed, trained or experienced securities traders, and together they had diminished savings, a lack of income, a relatively low net worth and substantial, mounting debt; (2) a total of $10,752,500.00 in checks, which were all in large, round dollar amounts of money from random third parties, were deposited into the Bennetts' PMA Account . . . without any justifiable purpose, and some of the checks specifically indicated in the memo section that they were for a "loan" or investment; (3) some of the money in the Bennett account was regularly transferred in large, round dollar amounts to [Schwab], a universally known investment services firm; (4) some of the money was immediately spent on lavish jewelry, luxury goods, a substantial mortgage for a penthouse, fancy cars, enormous charge card expenses and lines of credit, and gifts to charities; (5) some of the money was immediately sent in large, round dollar amounts to the Bennetts' children; (6) money was transferred back in large, round dollar amounts from [] Schwab to the Bennetts' account; (7) the Bennetts issued checks in large, round dollar amounts of money to third parties without any justifiable purpose other than the fact that the parties had originally deposited larger amounts of money with the Bennetts; (8) the Bennetts frequently and extensively used ATM machines for very large cash withdrawals (including a total of $25,800 in just a 90-day period); (9) the Bennetts' account had large, sudden and negative balances that caused several checks to bounce, thereby creating a large number of overdrafts, insufficient funds charges, and necessary reversals and repayments, which required the programming, oversight and approval of Wells Fargo personnel; (10) none of these account activities could be reconciled with the Bennetts' known personal and financial background; and (11) all of these activities were entirely inconsistent with the Bennetts' account history (which had average monthly deposits of $25,717 and average monthly expenses of $29,714 before the Ponzi scheme, but had average monthly deposits of $717,032 and average monthly expenses of $713,305 during the Ponzi scheme).

Dkt. #53 at 6-7.

Accepted as true, these facts support a reasonable inference that Wells Fargo knew of unusual, unprecedented, and unexplained levels of activity in the Bennetts' account. Wells Fargo reasonably knew that the Bennetts had come into large amounts of money beyond their own means, that they were transferring substantial funds to and from Schwab, that they were transferring money to and from other individuals, that they were distributing money to family, and that they were spending lavishly. In other words, Wells Fargo had

good reason to be suspicious about the activity in the Bennetts' account. Or, as the Sterns allege repeatedly, these facts raised "red flags" that should have prompted greater inquiry. Dkt. #39 at ¶¶ 36, 67, 77, 79. As explained above, however, suspicious activity does not satisfy the knowledge requirement of Arizona's aiding and abetting law.

These facts do not support a reasonable inference that Wells Fargo knew Mrs. Bennett was defrauding investors. The Sterns do not allege that Wells Fargo knew anything about her relationship with the individuals who provided the funds in her account. The Sterns allege that some checks deposited in the Bennetts' account included notations such as "loan" or "investment" in the memo line. Dkt. #39 at ¶ 76. Even if it could be inferred that the bank was conscious of these notations (typically provided so the check writer can keep track of why a check is written), the Sterns do not allege that Wells Fargo knew the nature of the loans or investments, that the money was provided on the basis of Mrs. Bennett's false representations, or that the money was provided on the basis of her promised 240-360% annual returns. Indeed, the Sterns do not allege that Wells Fargo knew anything about the relationship Mrs. Bennett had with the Sterns or other investors, the communications she had with them, or the level of disclosures she made to them.

The Sterns have not pled facts comparable to those found sufficient in *Arizona Laborers*. The Sterns do not allege that they were in a contractual relationship with Mrs. Bennett and Wells Fargo comparable to the tri-party agreement between Symington, the Funds, and the bank. The Sterns do not allege that Wells Fargo knew any of the details about the Sterns' dealings with Mrs. Bennett comparable to the detailed information possessed by the bank in *Arizona Laborers*. Where the circumstantial evidence in *Arizona Laborers* showed that the bank actually knew that one of their partners in the tri-party agreement was defrauding the other partner, the evidence in this case provides no such knowledge and no such connection.

As explained by the Supreme Court in *Iqbal*, it is not enough that facts alleged in a complaint are "consistent" with wrongful conduct – in this case, with knowingly aiding and abetting. The facts must "plausibly establish" the wrongful conduct. 129 S. Ct. at 1951

("Taken as true, these allegations are consistent with petitioners' purposefully designating detainees of 'high interest' because of their race, religion, or national origin. But given more likely explanations, they do not plausibly establish this purpose."). If the facts alleged are susceptible of two possible interpretations, one supporting liability and the other not, and the facts alleged do not make the liability-creating inference more plausible, then the complaint fails to state a claim. *Id*. ("As between [the] obvious alternative explanation [that the plaintiff was arrested for a legitimate law enforcement purpose], and the purposeful, invidious discrimination respondent asks us to infer, discrimination is not a plausible conclusion.") (quotation marks and citation omitted).

In this case, the factual allegations of the second amended complaint permit a reasonable inference that Wells Fargo had reason to be suspicious about the Bennetts' account – that it knew of red flags. The Sterns ask the Court to draw the stronger inference that Wells Fargo actually knew of Mrs. Bennett's fraud. As between these two, the first inference clearly is more directly supported by the alleged facts. Just as the complaint in *Iqbal* did not "contain any factual allegation sufficient to plausibly suggest petitioners' discriminatory state of mind," 129 S. Ct. at 1952, the Sterns' complaint does not contain any factual allegation sufficient to plausibly suggest Wells Fargo actually knew of Mrs. Bennett's fraud.

The Sterns seek to bolster their 55-page second amended complaint with some 500 pages of exhibits, including affidavits from two experts. They contend that the affidavits provide circumstantial facts showing actual knowledge of the fraud on Wells Fargo's part. The Court disagrees. Under the heading "Did Wells Fargo have actual knowledge of the fraud?" expert Charles Grice asserts that Wells Fargo knew of red flags: "multiple parts of the bank were aware of the anomalous and irregular transactions flowing through the Bennett account," and the bank "had sufficient alerts or alarms to stop the transactions as a means of protecting the Bank's reputation, these monies, and the innocent people involved." Dkt. #39-5 at 14. He does not opine that Wells Fargo actually knew of the fraud.

Expert Peter Davis conducted a detailed analysis of the Bennetts' account and found evidence to support his conclusion that Mrs. Bennett was operating a Ponzi scheme. He opines: "The Bennett Wells Fargo Account records, including bank statements, canceled checks and deposits show the Bennett Wells Fargo Account was used to operate a Ponzi scheme." Dkt. #39-3 at 7. Davis does not opine that Wells Fargo also knew this fact, nor does he explain how Wells Fargo could have replicated his detailed analysis conducted with the benefit of two years' hindsight and knowledge of Mrs. Bennett's fraud.

Thus, when it comes to Wells Fargo's actual knowledge of fraud, the experts add little beyond the allegations of the second amended complaint that Wells Fargo knew of unusual, unprecedented, and unexplained levels of activity in the Bennetts' account. They do not show that Wells Fargo knew Mrs. Bennett was defrauding the Sterns – the level of knowledge found sufficient in *Arizona Laborers*.

Finally, the Sterns argue that Wells Fargo had actual knowledge of the fraud because Melissa Dreifuerst, a vice president of a separate division of Wells Fargo – Wells Fargo Business Credit Company, Inc., located in Milwaukee, Wisconsin – knew about the fraud because she also invested with Mrs. Bennett. Dkt. #53 at 9. They contend that the following facts show actual knowledge or at least circumstantial evidence of actual knowledge: (1) Dreifuerst, a Wells Fargo vice president, invested with Mrs. Bennett (Dkt. #39 at ¶ 80), (2) Dreifuerst stopped investing before the Ponzi scheme failed and got most of her money back (Dkt. #39 at ¶ 82), (3) Dreifuerst knew enough facts to be aware of the Ponzi scheme and either participated in it or recklessly disregarded the facts (Dkt. #39 at ¶ 88), (4) Dreifuerst's actions were in violation of Wells Fargo's code of ethics (Dkt. #39 at ¶ 90), and (5) Dreifuerst was required to inform her supervisors of Mrs. Bennett's fraud (Dkt. #39 at ¶ 90). The Sterns do not allege that Dreifuerst, who is a relative of Mrs. Bennett, participated with Mrs. Bennett as part of Dreifuerst's employment at Wells Fargo. They do not allege that she acted on behalf of Wells Fargo in any dealings with Mrs. Bennett. To the contrary, they allege that she violated the Wells Fargo code of ethics by her actions. *Id*. Thus, even if it is assumed that each of these facts is true, they do not constitute actions by

Wells Fargo or knowledge on the part of Wells Fargo. More importantly, they do not amount to the widespread and actual knowledge of fraud that existed within the bank in *Arizona Laborers*. 38 P.3d at 24-26.

The Sterns contend that the Court must assume that Dreifuerst, who had a duty to inform Wells Fargo of Mrs. Bennett's fraud, actually did inform Wells Fargo because of "a conclusive presumption that the agent will communicate to the corporation whatever knowledge or notice he receives *in relation to his agency*." Dkt. #53 at 10 & n.9 (quoting *Fridena v. Evans*, 622 P.2d 463, 466 (Ariz. 1980)) (emphasis added). But the Sterns have failed to plead facts showing that she received information about Mrs. Bennett *in relation to her agency* as required by this authority. To the contrary, they allege that she received knowledge through her family connections with Mrs. Bennett and violated the Wells Fargo code of ethics in the process. Dkt. #39 at ¶¶ 82, 90. The Sterns have failed to allege facts showing that Dreifuerst's knowledge should be imputed to Wells Fargo.

In summary, the Sterns have failed to plead facts showing the scienter required for aiding and abetting. The Court will therefore grant Wells Fargo's motion to dismiss the aiding and abetting claims.

### C. Schwab.

Schwab also argues that the Sterns have failed to allege facts showing that it knew of Mrs. Bennett's fraud. Taking the facts in the second amended complaint as true and construing them in the Sterns' favor, the Court agrees.

As noted above, the Sterns' conclusory allegation that Schwab knew of Mrs. Bennett's fraud need not be accepted as true under *Iqbal*. 129 S. Ct. at 1951. Rather, the Court must "consider the factual allegations in [the] complaint to determine if they plausibly suggest an entitlement to relief." *Id.*

The key facts are summarized in three paragraphs in the second amended complaint and several paragraphs in an affidavit from securities expert Robert W. Lowry. The Sterns allege the following:

> Defendant Schwab knew of, had actual knowledge of and/or was generally aware of, the breach being committed by the Bennetts given its supervision and control of the Schwab Account, its acceptance of significant funds from the Wells Fargo PMA Account, and its extension of credit (margin) that aided the Bennetts in leveraging the funds in the Schwab Account. The amount of money transferred and recycled to and from the account greatly exceeded the amounts that could have been supported by the Bennetts' income, as indicated on their account application. The use of significant margin, engaging in day trading and short selling, the frequent turnover and recycling of funds in the account, and the large transfers in and out of the account must have alerted Defendant Schwab of the dubious, indeed illegal, activity taking place in the Schwab Account, prompting inquiry and action to expose and stop the fraud.

Dkt. #39 at ¶ 138. The facts pled in this paragraph are as follows: (1) Schwab supervised Mrs. Bennett's account, (2) Schwab accepted significant funds from a different account, (3) Schwab extended credit to Mrs. Bennett, (4) the amount of money moving in and out of Mrs. Bennett's accounts was higher than could have been supported by the Bennetts' income, and (5) Mrs. Bennett used significant margin, engaged in day trading, turned over significant funds, and made large transfers. *Id*. The Sterns allege, in effect, that these facts provided Schwab with sufficient information to prompt an investigation that would have exposed and stopped the fraud. In other words, this account, like the Wells Fargo account, raised red flags that should have attracted Schwab's attention. Indeed, the Sterns repeatedly allege that the account contained "red flags." *Id*. ¶¶ at 98, 105, 110.

Paragraphs 155 and 175 are similar. They allege that (1) Schwab supervised and controlled Mrs. Bennett's account, (2) Schwab accepted significant funds from a different account, (3) there were numerous transfers to and from another account, (4) millions of dollars cycled through the account, (5) Schwab extended credit to Mrs. Bennett, (6) the amounts of money moving in and out of the accounts were higher than could have been supported by the Bennetts' income, and (7) Schwab knew that Mrs. Bennett's stock trades were unprofitable. *Id*. ¶¶ at 155, 175. Again, these facts suggest that Schwab had reason to suspect some impropriety in Mrs. Bennett's account.

Lowry contends in his affidavit that Schwab monitored the trading activity in Mrs. Bennett's account, saw that she lost significant amounts of money (Dkt. #46-1 at ¶ 48), and, in his opinion, "had actual knowledge of Deborah Bennett's fraudulent activity, the operation

of a Ponzi scheme and money laundering" (Dkt. #46-1 at ¶ 61). This opinion of actual knowledge, of course, is not a statement of fact. It is an opinion Lowry asserts as the Sterns' expert. Like conclusory allegations of actual knowledge in the complaint, it must be based on factual allegations. The facts relied on by Lowry are those asserted in the complaint: Schwab had reason to know Mrs. Bennett was trading frenetically, with transfers from other accounts and money beyond her means, and was incurring substantial losses.

Accepting these facts as true and viewing them in the light most favorable to the Sterns, the Court reasonably can infer that Schwab had good reason to be concerned about the propriety of Mrs. Bennett's trading practices. But these facts do not reasonably support an inference that Schwab actually knew of Mrs. Bennett's fraud. The Sterns do not allege that Schwab knew other individuals were investing with Mrs. Bennett, only that she was transferring large sums of money from a Wells Fargo account. They do not allege that Schwab knew anything about Mrs. Bennett's relationship with the investors, representations to the investors, or disclosures to the investors. They do not allege that Schwab knew that Mrs. Bennett was transferring funds to her family, spending lavishly, or remitting funds to investors.

As with Wells Fargo, the facts alleged in the complaint, taken as true, support a reasonable inference that Schwab had reason to be suspicious of Mrs. Bennett's trading activities and reason to inquire further. Indeed, this is precisely what the Sterns allege. *See* Dkt. #39 at ¶ 98. When compared to the inference the Sterns would have this Court draw – that Schwab actually knew of Mrs. Bennett's fraud – the suspicious-activity inference is clearly the more plausible. Under *Iqbal*, the Sterns have failed to plead facts supporting a reasonable inference of actual knowledge on the part of Schwab. And without such actual knowledge, aiding and abetting liability does not arise under Arizona law. *Arizona Laborers*, 38 P.3d at 26; *Dawson*, 163 P.3d at 1053.

In summary, the Sterns' second amended complaint does not permit the Court "to infer more than the mere possibility of misconduct." *Iqbal*, 129 S.Ct. at 1950. "[T]he complaint has alleged – but it has not 'show[n]' – 'that the pleader is entitled to relief.'" *Id.*

at 1950 (citing Fed. R. Civ. P. 8(a)(2)).  Because the Sterns have failed to plead the scienter required for aiding and abetting liability under Arizona law, judgment on the pleadings must be granted.

**V.    Conclusion.**

As noted at the outset, this case asks whether a bank and an investment firm, under Arizona law, have a negligence duty to protect third parties from fraud committed by a customer of the bank and investment firm.  The Court concludes that the answer is no.  Once negligence is eliminated as a possible source of liability, the Sterns are left with their claims that Defendants aided and abetted Mrs. Bennett in her fraud, breach of fiduciary duty, and securities fraud.  The Court concludes that Arizona law requires actual knowledge of the fraud, breach of fiduciary duty, and securities fraud before aiding and abetting liability arises, and that the Sterns have not pled facts sufficient to show such knowledge.

Both motions will be granted.  Wells Fargo asks the Court to dismiss the claims against it with prejudice.  The Sterns do not address this request.  Given that the Sterns have made three unsuccessful attempts to plead sufficient facts to state a claim, *see* Dkt. #2-1 at 5-39, Dkt. #14, and Dkt. #39, the Court will grant the request and dismiss the claims against Wells Fargo with prejudice.

**IT IS ORDERED:**

1.     Wells Fargo's motion to dismiss with prejudice (Dkt. #47) is **granted**.

2.     Schwab's motion for judgment on the pleadings (Dkt. #33) is **granted**.

3.     The Clerk of Court shall terminate this action.

DATED this 23rd day of March, 2010.

David G. Campbell
United States District Judge